# Richmond

## HATTIE V. PARKER, ADM'X, ETC. v. NORFOLK ORANGE CRUSH BOTTLING CO., INC.

April 8, 1940.

Record No. 2206.

Present, All the Justices.

The opinion states the case.

*Q. C. Davis, Jr.*, and *Herman A. Sacks*, for the plaintiff in error.

*Earl W. White*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The trial court set aside a verdict for $7,500 returned by the jury for plaintiff in an action against the Norfolk Orange Crush Bottling Company for the wrongful death of N. L. Parker. To a final judgment entered for defendant dismissing the action, plaintiff sought and obtained this writ of error.

N. L. Parker, a carpenter, who lived on Liberty street in South Norfolk, was building a house in Portlock for L. C. Costen. On December 3, 1938, at 5:30 p. m., he started home from Costen's store riding a bicycle. While rolling his bicycle on Bainbridge boulevard up the steep incline leading to the overpass across the Virginian Railway right of way between Portlock and South Norfolk, he was struck by a truck owned and operated by defendant, and died from the injuries received.

The trial court held that it was the duty of a person rolling a bicycle along the highway to travel—as a pedestrian—on the left side of the highway, and that, as decedent was rolling his bicycle on the right side of the highway, he was guilty of contributory negligence as a matter of law; and that the record did not contain sufficient evidence to support a verdict based on the doctrine of the last clear chance, which was the only issue on the liability of defendant submitted to the jury. These two rulings of the trial court are the bases of the two errors assigned.

The one vital question presented is whether the evidence was sufficient to have warranted the trial court in giving instructions embodying the doctrine of the last clear chance.

The accident occurred on a steep grade or incline extending for 1,250 feet from a level on Bainbridge boulevard up to a wide overhead bridge across the right of way of the Virginian Railway. At the beginning of this grade, or the bottom of the incline, the traveled portion of the boulevard is 38 feet wide with three traffic lanes indicated by white marks. The place of impact was about halfway up this incline and just beyond the point where the three traffic lanes merged into two and the width of the highway decreased from 38 to 30 feet.

Decedent customarily used a bicycle in going to and from his work. On the day in question he was wearing a light gray hat and a gray overcoat. The bicycle was equipped with a red tail-light reflector about the size of a half dollar and a headlight, which was lighted. While there is no direct evidence on the subject, the inference from all the evidence is that decedent was unable to pedal his bicycle up the steep grade and had temporarily dismounted for the purpose of rolling his bicycle up the incline to the bridge. At any rate, while rolling the bicycle very near the right side of the traveled portion of the highway, he was struck from behind on his head and shoulder by the overhang of the body of defendant's truck. The force of the impact threw decedent and his bicycle to the right of the truck and partly on the right shoulder of the highway.

■ We will assume, for the purpose of the discussion of the question now under consideration, that decedent was in a state of negligence while rolling his bicycle on the right side of the traveled portion of the highway. Still it was the duty of the operator of defendant's truck to keep a lookout and to use ordinary care and caution commensurate with obvious danger to avoid striking and injuring other users of the highway.

The operator of the truck testified that he did not see decedent moving and rolling his bicycle until his companion, sitting on the same seat, "hollered" and he felt the impact. He claimed that he was unable to see in front of him because he was blinded by the headlights of a car approaching from the opposite direction and going down the incline. W. E. Gladstone, another agent of defendant and chief operator of the truck, sitting in the cab to the right of his helper, the actual operator, said that he had his head out of the cab window watching the road ahead, that it was drizzling rain and that the fog was so thick that he could not see decedent until the front of the truck was 10 to 12 feet from him. On seeing decedent, he called to the driver, " 'for the Lord's sake, Slim, there is a man,' and the man turned around, and by that time there was the impact."

If the fog was so thick that Gladstone, sitting beside the driver with his head out of the window, could see only 10 to 12 feet ahead of the truck, then the fog was so thick that the driver could not have been blinded by the glare of the headlights on an approaching car. The testimony of these two witnesses as to the density of the fog is in conflict, and tends to create a mental fog as to how the accident occurred.

J. J. Murphy, meteorologist in charge of the Norfolk office of the United States Weather Bureau, testified that between five and six o'clock on the date of the accident the record of the weather department showed that there was a light drizzle of rain but no fog, that the velocity of the wind was approximately 14 miles per hour, that these conditions were the same within five or six miles of the Post

Office building where the observations were made, and that the overhead bridge was approximately four miles on a straight line from the Weather Bureau.

Two negroes, traveling on the boulevard in an automobile, followed the truck for 4 or 5 city blocks before it struck decedent. These witnesses said that it was drizzling rain and foggy, that sometimes they were closer to the truck than at others but that they could see the dark body of the truck some of the time and the head- and tail-lights on the truck all of the time while following it. At the moment of impact they were traveling from 20 to 25 miles an hour and were approximately 50 feet from the rear of the truck, which was 20 feet long, and saw a dark object, which they later ascertained to be decedent, "fly from the side of the truck to the shoulder of the road." The stop light on the rear flashed on as the body of the truck came into contact with decedent. Immediately on seeing the flash of the stop light and decedent's body, the driver of the negroes' automobile applied his brakes and stopped the automobile 20 feet from the rear of the truck. The driver of this automobile was not blinded by the headlights of an oncoming car and did not remember whether another car met them or not. The passenger, sitting to the right of the driver, stated that he was under the impression that another car passed going down the incline at the time of the accident. No other automobile stopped at the scene.

If the occupants of the automobile following the truck could see, as they said they did, the body of decedent at the moment of impact when they were at least 64 feet away, it seems that the operator of the truck could have seen decedent, if he had maintained a proper lookout, in time to have stopped his truck before striking him.

The truck was equipped with a fog or spot light, which was burning. The statute provides: "Any motor vehicle * * * may be equipped with not to exceed one spotlight or ditch light which when lighted shall be aimed and used so that no portion of the beam will be directed to the left of the center of the highway at any time or more than one

hundred (100) feet ahead of the vehicle, and shall be of a type that has been approved by the director." Motor Vehicle Code, section 94 (h), Acts 1932, ch. 342.

Pursuant to this provision, the Division of Motor Vehicles has adopted the following regulation: "Such lamps shall be aimed straight ahead or slightly to the right with the center of the high intensity portion of the beam (the 'hot spot') aimed six inches (6″) below the level of the lamp center at a distance of 25 feet ahead of the lamps. No bulb greater than 32 cp. may be used."

W. E. Gladstone, on cross examination, stated: "I had the bright lights and the fog lights, and the fog light was shining right down the side of the road, and I judge you could see twenty-five or thirty feet. * * *

"Q. How far could you see it with your regular lights, the two lights from the headlights?

"A. With the fog, it was bad. If I didn't have my fog light on, I couldn't say.

"Q. You were using your fog light so you could see further ahead?

"A. That is correct."

According to the testimony of this witness, if he had been looking, he could have seen the white line in the center of the highway and somewhat to the left of the truck for a distance of 25 to 30 feet in front. The fog light made objects on the highway immediately in front of the truck and as far to the right as the edge of the highway plainly visible for a greater distance. Decedent was struck by the front right corner of the truck body where it projects to the right immediately behind the cab. Decedent, rolling a bicycle with the headlight burning and a red tail-light reflector, was within three feet of the right edge of the highway, plainly within the rays of the fog light for more than 30 feet in front of the truck, which could have been stopped within 15 to 20 feet traveling at a rate of speed estimated to be 20 to 25 miles an hour.

█ A careful examination of all the evidence convinces us that it was sufficient to carry the case to the jury on the

doctrine of the last clear chance. The evidence presents a factual situation where the jury could, with reason, have found, as they evidently did find, that if the driver of the truck, who did not see decedent at all before the impact, had been keeping a proper lookout he could have seen decedent rolling a lighted bicycle up a steep incline in ample time to have stopped his truck if necessary to avoid inflicting injuries upon him. For a discussion of the doctrine of the last clear chance, see *Virginia Electric & Power Co.* v. *Whitehurst, Adm'r, Etc., post,* page —, 8 S. E. (2d) 296, decided at this term of court.

This conclusion necessarily decides the case. Any attempt to decide the question, whether an operator of a bicycle, who temporarily dismounts for the purpose of rolling his bicycle upgrade, is a pedestrian, within the meaning of the statute requiring all pedestrians to travel on the left side of the highway, would result in adding expressions to the opinion which would be *obiter dicta.*

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury reinstated, and final judgment entered here thereon.

*Reversed and final judgment.*