# Richmond

## Virginia Electric and Power Company v. Lawrence G. Whitehurst, Adm'r, etc.

April 8, 1940.

Record No. 2188.

Present, All the Justices.

340

The opinion states the case.

*T. Justin Moore* and *Leigh D. Williams,* for the plaintiff in error.

*Broudy & Broudy,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the proceedings in an action against the Virginia Electric and Power Company for the wrongful death of C. M. Whitehurst that resulted in a verdict for $2,500 in behalf of plaintiff, on which the trial court entered judgment.

The accident occurred at the intersection of Granby and Orchard streets in Norfolk, Virginia. At this intersection and for some distance in each direction on Granby street there are two motor traffic lanes, one for northbound and the other for southbound vehicles. In the center between these traffic lanes there is a narrow strip of land owned by the Virginia Electric and Power Company, on which it has constructed double tracks for the operation of street cars, one for northbound and the other for southbound cars. At intervals between the sets of rails are trolley poles, to which are attached wires for the transmission of electric power. There are grass plots between the motor traffic lanes and the rails, and between the northbound and southbound tracks, but between the rails there is a depression of several inches, the distance between the top of the steel rails and the top of the ties upon which the rails rest. At the street crossing the intersection is 22 feet east and west by 30 feet north and south paved with cobble stones.

C. M. Whitehurst, 76 years of age, lived with his daughter near the intersection of Orchard and Granby streets. His children furnished him transportation over the line of the Virginia Electric and Power Company and tickets to motion pictures in Norfolk, both of which were used by him several times a week. About six-thirty p. m. on October 5,

1938, while attempting to cross Granby street from east to west at this intersection, he was struck by a northbound street car operated by the defendant company, and later died from the injuries received.

The first assignment of error is to the action of the trial court in refusing to set aside the verdict on the ground that plaintiff's decedent was guilty of contributory negligence as a matter of law.

■ The well-established rule compels this court to state the evidence and to draw all fair inferences therefrom in a light most favorable to the litigant who has obtained the verdict in the trial court.

Though C. M. Whitehurst was an old man, he was able to stand and work at a barber's chair all day. However, it was apparent that he walked slowly with a shuffle, taking short steps and making approximately a mile and a half an hour.

Granby street is straight and practically level for 750 feet south of its intersection with Orchard street. At the time decedent was struck, the visibility was good, the overhead crossing light was burning, and the headlights of the street car, as well as the lights within it, were on and burning brightly. The decedent was familiar with the crossing. He knew that this was a regular car stop, as was indicated by an orange and white band around a pole situated midway between the two sets of tracks and 6½ feet south of the intersection; and that northbound street cars usually stopped at the south end of the 30-foot intersection, sometimes referred to in the record as a ramp, to receive and discharge passengers. He could see the car approaching from the south and slowing down as if to make a regular stop at its regular place, which was several feet south of the decedent's line of travel from east to west. He could very probably see through the windows of the car a passenger walking toward the front with the evident intention of leaving the car at this intersection.

All of the witnesses, except the motorman, who testified on the subject, whether called by plaintiff or defendant, stated that the car was perceptibly slowing down as if to

stop at the intersection in its customary place. One or more witnesses testified that the car, when approximately 50 feet from the crossing, was approaching at 8 miles per hour. Another witness, who was a passenger on the car, testified that, a car length south of a certain pole which the map shows to be some 216 feet south of Orchard street, he gave the signal for the car to stop at the next intersection; that the speed of the car began to diminish as soon as he gave the signal; and that he then arose and began to walk toward the front of the car.

Defendant company lays much emphasis on the fact that it owns its right of way in fee and therefore should be entitled to operate its street cars across intersections with the same rights and privileges accorded to the operation of steam railroads in rural sections crossing public highways.

Every railroad train operated by steam outside of incorporated cities and towns is required to give certain signals when approaching highway crossings. Code, section 3958. If these signals are not given and a traveler upon the highway suffers injury to his person or damage to his property, the doctrine of comparative negligence is applicable.

This was one of many street crossings erected and maintained for the use of pedestrians and vehicles in a thickly populated residential area in the city of Norfolk. The crossing, even if owned in fee by the defendant company, had been set apart for the free use of the public with the knowledge, consent and invitation of the defendant company. If the operators of street cars across this intersection were permitted to run them upon the assumption that east- or westbound travelers would not attempt to cross the tracks if an approaching car could be seen or heard, however distant, there would be little, if any, safety for such travelers crossing the intersection. *Virginia Ry. & P. Co.* v. *Meyer,* 117 Va. 409, 84 S. E. 742.

It is stated in 25 R. C. L. 1284, that, "in a populous, active business city it would be an anomaly to hold that every traveler, in endeavoring to cross a street car track, must look and listen for a car, and if he can hear or see

one distantly approaching he must wait until the car has passed before attempting to cross the track. This is certainly not required."

It is unreasonable to apply any such rule to street crossings or intersections in a section of the city as thickly settled as this appears to be. All that can be reasonably required is that a traveler, intending to cross the tracks at a street intersection ahead of an approaching street car, shall use ordinary care and caution commensurate with known or obvious danger to avoid injury to himself.

Defendant further contends that the case is controlled by that line of Virginia decisions beginning with *Derring's Adm'r* v. *Virginia Ry. & P. Co.*, 122 Va. 517, 95 S. E. 405, which holds that a person is guilty of contributory negligence as a matter of law who, while looking at a closely approaching car, steps in front of the same, relying upon the assumption that the car will stop because passengers are at the corner waving it down. In that case Judge Burks, speaking for the court, said: "The intestate was laboring under no physical disability. The car was in full view, and he was 'looking at the car approaching.' The motorman had the right to assume that he would not step in front of it. It was his (the pedestrian's) duty to see that the car *had slackened its speed or stopped* before going on the track in such close proximity to it." (Italics supplied.)

The differentiating facts in the case at bar are: First, the pedestrian in this case was laboring under a physical disability which was obvious to anyone who saw him in motion; second, the street car was perceptibly slowing down and, at a distance of 50 feet, was traveling at only 8 miles an hour; third, passengers were walking toward the front with the apparent intention of leaving the car at its usual and regular stopping place, which was at least 10 feet south of the point at which the decedent was moving at the time he was struck. These distinguishing features were not in any of the large number of cases cited by the defendant company.

It was said by Mr. Justice Gregory, speaking for the court in *Virginia Electric & Power Co.* v. *Wright,* 170 Va. 442, 446-448, 196 S. E. 580, 581: "It accomplishes nothing to refer to and quote from all of the negligence cases that have been decided by this court. Nor will it be advantageous to try to reconcile the cases. The principes are well settled. The application of them to the varying facts is a difficult problem. No two cases are identical in their essential facts. * * * .

"Generally, at a trial by jury, the burden rests upon the defendant to show such (contributory) negligence by a preponderance of the evidence, but here on appeal when the defendant asks us to hold, as a matter of law, that the plaintiff was guilty of contributory. negligence, he must do more. He must show that there is no conflict in the evidence of contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole, sustaining the conclusion that the plaintiff was free of contributory negligence."

 Ordinary care for one's own safety does not require one to absolutely refrain from exposing himself to peril. It does require a person to use that degree of watchfulness and precaution to avoid coming into danger which a person of ordinary prudence would use for his own protection under the same circumstances in view of the danger to be avoided. *Newport News, etc., R. Co.* v. *Bradford,* 99 Va. 117, 120, 37 S. E. 807. Judge Harrison, in *Norfolk & P. Co.* v. *Forrest,* 109 Va. 658, 668, 64 S. E. 1034, 1038, expressed the same principle thus: "The law does not require a person to know that he is absolutely safe before taking a given course of action * * *; he is only required to exercise ordinary care to avoid accident—such care as a reasonably prudent person would exercise under like circumstances." *Roanoke R. & E. Co.* v. *Loving,* 137 Va. 331, 119 S. E. 82.

 The factual situation disclosed by this record and stated from plaintiff's point of view made it imperative on

the trial court to submit the question of decedent's contributory negligence to the jury.

The next assignment of error is based upon the action of the trial court in giving to the jury, over defendant's objections, instructions embodying the doctrine of the last clear chance.

This doctrine is precisely what the name implies—that is, that one of the litigants had a last clear chance to avoid inflicting the damage or injury, notwithstanding the fact that the other litigant had previously placed himself or his property in a position of peril. The doctrine seems to have had its origin in an old English case, *Davies* v. *Mann,* reported in 19 Eng. Rul. Cas. 190. The facts were that the owner of a donkey left him on the highway so fettered as to prevent him from getting out of the way of vehicles. The defendant's servant, while driving his carriage at an excessive speed, struck and injured the donkey. In upholding a verdict and judgment for plaintiff, the appellate court said: "And the judge simply told the jury that the mere fact of negligence on the part of the plaintiff in leaving his donkey on the public highway was no answer to the action, unless the donkey's being there was the immediate cause of the injury; and that, if they (the jury) were of opinion that it was caused by the fault of the defendant's servant in driving too fast, * * * , the mere fact of putting the ass upon the road would not bar the plaintiff of his action."

Contributory negligence and the doctrine of last clear chance have no bearing upon the question of the duty of the parties to each other. They have, however, an important bearing upon the rights and liabilities of the parties after an injury has been inflicted. It is the duty of a person to use care not to injure another. Contributory negligence does not justify the non-performance of this duty. It only relieves from liability to pay for its consequences. *Elliott* v. *New York, N. H. & H. R. Co.,* 83 Conn. 320, 76 A. 298.

If defendant had a last clear chance to avoid inflicting injury, notwithstanding the fact that plaintiff had not exer-

cised due care for his own safety in going on the tracks, then the negligence of the defendant is the sole proximate cause of the injury, and the negligence of the plaintiff is the remote cause. This principle has been applied frequently by this and other courts to various factual situations. See *Bennett* v. *Spencer,* 167 Va. 268, 189 S. E. 169; *Dobson-Peacock* v. *Curtis,* 166 Va. 550, 186 S. E. 13; *Keeler* v. *Baumgardner,* 161 Va. 507, 171 S. E. 592; *Kinsey* v. *Brugh,* 157 Va. 407, 161 S. E. 41; *Caplan* v. *Arndt,* 123 Conn. 585, 196 A. 631, 119 A. L. R. 1037, and note 1041; and note 92 A. L. R. 47.

Fair-minded men may, with reason, differ as to whether plaintiff's decedent exercised proper care for his own safety when he attempted to cross the tracks in front of an approaching car under the circumstances heretofore stated. Whether he did fail to exercise the care and caution that a reasonably prudent man would have exercised under the same circumstances, as already stated, was a question for the jury. Assuming that decedent failed to exercise this care in attempting to negotiate the crossing, the question now under consideration is, Does the evidence present a situation in which the defendant, by the exercise of ordinary care and caution, could have avoided striking the decedent after he had placed himself in the position of peril?

While there was a sharp variance in the witnesses' estimates of the speed of the street car, the testimony most favorable to plaintiff was that the car was slowing down and at 50 feet from the crossing was traveling only 8 miles an hour. At this rate of speed and under the conditions then existing the car could have been stopped within 25 feet. The operator of the car stated that when he first saw decedent, decedent was approaching but had not reached the rail, and that when he was approximately 75 feet from the crossing it was evident to him that decedent was "going on the track," and at that moment he applied the emergency brakes. As the physical condition of decedent was obvious, the operator knew that the pedestrian approaching the track did not have full possession of his physical faculties. The

testimony as to whether or not the operator applied the emergency brakes is in sharp conflict. Several witnesses stated that the emergency brakes were not applied before the impact. One witness, V. J. Boyce, said that when he reached the front of the car it was 20 to 30 feet from decedent, who was then halfway between the rails and moving west. He further said that, on seeing the man upon the tracks and perceiving his physical condition, "he was standing there * * * waiting for the emergency brake * * * expecting it and it did not occur." There was no sudden jerking or stopping of the car until after it had struck decedent. Thereafter the front of the car continued across the intersection and 20 feet beyond the northern edge of the ramp with the decedent underneath and between the two front wheels.

If the car was traveling at 8 miles an hour 50 feet from the crossing and slowing down, it would have taken at least 4½ seconds for the front of it to have reached the southern edge of the intersection. Decedent, traveling at 2¼ feet per second, would go approximately 6 feet in a little less than 3 seconds. Upon the hypothesis produced by the foregoing evidence, it appears that if the operator had applied emergency brakes when the car was 75 feet from the intersection and approximately 15 feet further from decedent, the car would have been stopped a number of feet south of the point of impact. It was the duty of defendant to apply its emergency brakes when its agent saw, or, in the exercise of ordinary care, should have seen, decedent with his perceptible physical disability in the position of peril.

Other testimony tends to prove that after the operator had received a signal from a passenger to stop at Orchard street, the car traveled 216 feet to this intersection, 30 feet across the intersection and 20 feet beyond the northern edge, a distance of 266 feet. This bit of evidence is cited, not for the purpose of intimating that decedent could rely upon the fact that a passenger had signaled his desire for the car to stop at the intersection, but for the purpose of showing how far the car traveled after the brakes were first applied.

The entire evidence on this phase of the case was sufficient for the jury to have found, as they evidently did find, that there was a sufficient interval of time, after it was apparent that the decedent, laboring under a physical handicap, came into the danger zone, for the operator of the car to have perceived his peril and to have taken effectual means to stop the car before it struck him. This being true, the trial court committed no error in giving the instructions in question.

The other errors assigned were not stressed in the argument and are not of sufficient importance to discuss. The judgment of the trial court is

*Affirmed.*

EGGLESTON and SPRATLEY, JJ., dissenting.