## PECK v. UNITED STATES.
### No. 6368.

United States Court of Appeals
Fourth Circuit.

Argued March 6, 1952.

Decided March 29, 1952.

Leonard G. Karp, Portsmouth, Va. (Louis Brenner, Portsmouth, Va., on brief), for appellant.

Charles R. Dalton, Jr., Asst. U. S. Atty., Norfolk, Va. (A. Carter Whitehead, U. S. Atty., Richmond, Va., on brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346 et seq., 2671 et seq., grows out of an accident in which Homer Peck, the plaintiff-appellant, was severely and permanently injured while crossing the George Washington Highway in Norfolk County, Virginia, at a regular intersection in broad daylight on the morning of May 12, 1949. He was struck by a government owned station wagon driven by J. S. Edwards, a sailor, who was engaged at the time on business for the United States Navy. The District Judge found the facts and entered judgment for the United States since he was of the opinion that the accident was caused solely by the neglect of the injured man and, because of his neglect, the driver of the car had no clear chance to avoid the collision.

There is no substantial dispute as to the facts, which we shall state as they appear most favorably to the defendant, and the decision turns on the reasonable inferences to be drawn from the facts under the law laid down in the statutes and the decisions of Virginia. The accident occurred at the crossing of the George Washington Highway, a road which runs north and south, with Bainbridge Avenue, which runs east and west. The highway is 32 feet wide and consists of three traffic lanes, the outside lanes being each 12 feet and the middle lane 8 feet wide. South of the crossing the east lane is separated from the middle lane by a solid double line while the western and middle lanes are separated by a single dot-

ted line. There was no traffic on the roads at the time which interfered with the vision of either Peck or the occupants of the car as they neared the point of collision. There is a traffic light at Afton Parkway which crosses the highway two short blocks, each 226 feet in length, south of Bainbridge Avenue.

Peck left the southwest corner of the intersection intending to cross the highway in an easterly direction, in order to purchase some ice cream for his grandniece who was standing at the curb with him. Looking towards his right, when he started, he saw the station wagon stopped at the traffic light. He says he looked again while crossing and saw nothing to interfere with him; but the more credible evidence, which accords with the court's findings, is that as he proceeded across the street he was talking to his grandniece over his left shoulder with his eyes turned away from the approaching car. At that time the car was going at the rate of 25 to 30 miles an hour and the driver, seeing that Peck was looking backward, exclaimed to his companions in the car "that guy is not even looking where he is going." When Peck reached the double line, or a point distant a foot or two from the line on one side or the other, the driver blew his horn. Thereupon Peck turned, saw the car, stopped and then unfortunately rushed forward in an attempt to cross ahead of it and was struck when he was about in the center of the eastern lane.

The driver first saw Peck after he had left the west curb of the highway and was approaching the path of the car in the manner above described. At that time, according to the driver's statement, the car was still a block or three-quarters of a block away. The driver said he sounded the horn of the car for the first time when he was two or three car lengths away from Peck; a companion of the driver in the car said that the horn was sounded when the car was about 100 feet from Peck. The driver applied his brakes for the first time after Peck stopped and tried to dash across the street when the car was only 10 to 14 feet away from him. At that time the car was going 25–30 miles per hour.

The only reasonable inference from this testimony is that the driver thought he had done his full duty when he blew his horn before. Peck had gotten into the path of the car; and it is suggested that the evidence shows that the plaintiff stopped for "several seconds" after he heard the horn of the car and turned towards the car before he dashed in front of it, and hence the driver had the right to assume that the plaintiff would stay in a place of safety and not try to cross in front of the vehicle. It has been held in Virginia that an automobile driver, who is otherwise free from negligence, who sees a pedestrian in a place of safety on or near the highway, has a right to presume that the pedestrian will exercise ordinary care to protect himself from injury. Jenkins v. Johnson, 186 Va. 191, 42 S.E.2d 319; Willard Stores, Inc. v. Cornnell, 181 Va. 143, 23 S.E.2d 761. There is, however, no basis for this argument in the facts of this case. There was no evidence that the plaintiff paused for several seconds after he heard the horn, and the judge made no such finding. Indeed had the plaintiff stopped for several seconds the car would have easily traversed the distance of two to four car lengths and passed the point of collision without accident. The evidence shows unmistakably that the plaintiff, startled by the unexpected appearance of danger, suddenly took the wrong course to avoid it.

The real inquiry is whether the plaintiff's obvious neglect relieves the defendant of all liability for the injury. It seems obvious under the admitted facts and the law of Virginia that the judgment in the defendant's favor cannot be sustained since it fails to give proper consideration to the established rule that the plaintiff and not the automobile had the right of way at the crossing, and since the driver actually saw the man in time to stop the car and to save him from the serious consequences of his neglect, but failed to take appropriate action.

■ Section 46–244 of the Code of Virginia of 1950 provides:

"Right of way of pedestrians.—The driver of any vehicle upon a highway within a business or residence district

shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary lines of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices.

"No pedestrian shall enter or cross an intersection regardless of approaching traffic.

"The drivers of vehicles entering, crossing or turning at intersections shall change their course, slow down or come to a complete stop if necessary to permit pedestrians to safely and expeditiously cross such intersection."

The Supreme Court of Virginia in a number of decisions has forcibly commented upon the duty imposed by this statute upon the driver of a motor vehicle to keep a vigilant lookout, to give timely warning of his approach, and to keep his machine under control at street crossings so as to avoid injury to pedestrians. In Lucas v. Craft, 161 Va. 228, 234, 170 S.E. 836, 838, the court said:

"The language and intent of the General Assembly is so plainly expressed in the statute that it needs no interpretation or construction. It means what is said. At intersecting streets where there are neither traffic lights nor traffic officers, the pedestrian has a superior right—that is, the right to cross from one side of the street to the other in preference or priority over vehicles—and drivers of vehicles must respect this right and yield the right of way to the pedestrian. The pedestrian's right of way extends from one side of the street to the other. It does not begin at any particular point in the intersection, nor does it end at any particular point. It begins on one side of the street and extends until the pedestrian has negotiated the crossing. It is impossible, without nullifying the statute, to divide this right of way into

different stages in the intersection, yielding the right of way to the pedestrian at one point in the intersection and denying it at another, all at the time of negotiating the one crossing."

See also, Sawyer v. Blankenship, 160 Va. 651, 658, 169 S.E. 551, 553, where it is said:

"The duty of a motor vehicle driver on approaching an intersection is to keep a vigilant lookout for pedestrians between curbs on the traveled portion of the highway, and when pedestrians are negotiating the crossing, or about to step from the side into traffic lanes, to operate his car at such speed and under such control that he can readily turn one way or the other, and, if necessary, bring his machine to a stop in time to avoid injury to pedestrians."

It is evident that the driver's conduct in the pending case was at variance with this well established rule. The plaintiff was not only exercising his legal right to cross the street at a regular intersection, but was about to walk in front of the rapidly moving car oblivious of its approach, and this situation was visible to and actually seen by the driver. Yet he did not slow down and yield the right of way, but proceeded as if the right of way belonged to him and not to the pedestrian. He was not absolved from his duty to yield by sounding his horn when the plaintiff was on and near the double line and looking backward. This was in effect a denial of the pedestrian's superior right. Nor was he relieved from liability by the sudden dash of the plaintiff, taken in panic when he realized his imminent danger, for it was the driver's bounden duty to have his car under control to meet all emergencies when he first saw the plaintiff approaching the path of danger. It was at this moment that the driver's last clear chance began and since it was then available to him and he failed to take it, liability is established under the Virginia law. For a discussion of the last clear chance doctrine in Virginia see Virginia Elec. & Power Co. v. Whitehurst, 175 Va. 339, 8 S.E.2d 296; State of Maryland for Use of Joynes v. Coard, 175 Va. 571, 9 S.E.2d 454.

The judgment of the District Court must be reversed and the case remanded with directions to enter judgment for the plaintiff in such a sum as the court may find will compensate him for his injuries.

Reversed and remanded.