## Richmond

VIRGINIA ELECTRIC AND POWER COMPANY

V.

ANNA RUTH WINESETT, ADMINISTRATRIX, ETC.

June 17, 1983.

Record No. 801872.

Present: Carrico, C.J., Cochran, Poff, Compton, and Stephenson, JJ., and Harrison, Retired Justice.

460

*G. H. Gromel, Jr. (Matthew J. Calvert; Hunton & Williams*, on briefs), for appellant.

*Harvey B. Cohen (Joanne F. Alper; Thomas W. Williams, Jr.; Emanuel Emroch; Cohen, Gettings & Sher; Emanuel Emroch and Associates*, on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Anna Ruth Winesett, Administratrix of the Estate of James Woodrow Winesett, deceased, filed a motion for judgment for damages against Virginia Electric and Power Company (Vepco). The administratrix alleged that Vepco's negligent operation and maintenance of certain electric distribution wires had caused the death by electrocution of her husband while he was trimming a tree on private property. In a jury trial, a verdict was returned in favor of the administratrix in the amount of $182,796, to be apportioned as therein specified; the trial court entered judgment on the verdict.

We granted Vepco an appeal limited to three questions: whether the decedent was contributorily negligent as a matter of law, whether there was evidence that any negligence of Vepco was the proximate cause of his death, and whether Vepco was entitled to have the jury given an instruction on assumption of risk. According to established principles, the administratrix, with a verdict approved by the trial court, is entitled to have the evidence viewed in the light most favorable to her in our consideration of the first

two questions. The evidence is to be viewed in the light most favorable to Vepco, however, in determining whether the trial court erred in refusing to grant the proffered instruction on assumption of risk.

In October of 1976 a maple tree was growing in the front yard of Robert W. Carl's residence in Arlington. Three utility lines, strung above a grassy walkway between the street and the front wall of the yard, extended between two poles belonging to the telephone company. The bottom line was an insulated telephone cable. The second line, 25 feet 4 inches above the ground, was a secondary Vepco line, a configuration of three wires, known as a triplex, consisting of two insulated[1] "hot" wires intertwined with a bare, shiny, neutral wire. The highest line, 30 feet 8 inches above the ground, was a primary Vepco line, a bare, dark-colored uninsulated copper wire about two-tenths of an inch in diameter carrying 7,200 volts of electricity. This top wire was the smallest in diameter of all the wires.

The Carls' yard sloped from the house to the wall at the street; the base of the maple tree was more than four feet higher than the ground directly underneath the service wires. Branches of the tree had grown through the wires and protruded on the other side a distance of as much as two or three feet. One night in February or March of 1976 when freezing rain had fallen, a neighbor observed the tree branches tapping on the electric wires in 10 to 14 places within the space of six feet. Each contact caused a white spark and a popping sound.

Carl became concerned about the branches touching the wires. In August of 1976 he telephoned the Vepco offices and reported to three employees the problem of the branches possibly causing an "electrical hazard" by touching the wires in wind or snow. When no action was taken by Vepco, Carl decided in October to have the maple tree removed at his own expense. He telephoned Winesett, who had painted the Carls' house inside and out and had done general work for them, and "explained the problem" about the limbs touching the wires. Winesett "felt sure that he could handle it." Carl did not discuss directly with Winesett the

---

[1] Our use of the words "insulated" and "uninsulated" is based upon the presence or absence of a covering on a wire. Although Vepco argued that the material covering wires in the triplex afforded no protection and was not an insulator as defined by electrical engineers, we believe, as a Vepco employee conceded at trial, that a wire covered as these were is commonly known as an insulated wire.

existence of the power lines or tell him about the "sparking." Winesett, who had never done any tree work for Carl, gave assurances that he could take down the maple tree, agreed to do so, and Carl had "complete faith" in his ability to do the job.

On October 4, a clear, dry day, Winesett and a helper, Thomas P. McClennan, arrived with a rented electric chain saw to cut down the tree. McClennan had no knowledge that the top wire was an uninsulated high-voltage line, nor did Winesett say anything to indicate that he had such knowledge. McClennan did not know what the wires were. He "knew they were wires of some kind carrying something," but he did not know whether they were telephone wires. If there was any "big power being carried in these lines," McClennan testified, he "would assume it was being carried in the big lines, the two bottom ones," because they appeared to be insulated. The principal concern of Winesett and McClennan was that some of the wires might be broken; a broken wire would hit the ground, set off sparks, and endanger persons. For this reason the two men planned to cut the tree so that the limbs would not hit the wires.

Winesett, using the chain saw plugged into an outlet in the house and an aluminum ladder of Carl's, did the cutting. McClennan, who remained on the ground, stacked the cut branches. They used no ropes on the job and wore no protective clothing. During the cutting, one branch that had been cut brushed the top wire before falling to the ground, but nothing happened. After they had been working about half an hour, McClennan heard Winesett scream, "Unplug the saw." McClennan did so, then went up the ladder twice to assist Winesett. McClennan received shocks from the ladder and from Winesett when he grasped him by the legs. Winesett fell from the tree. Wherever McClennan moved in the tree, he received an electric shock; he was unable to descend until Vepco personnel rescued him.

The last branch Winesett cut remained partially attached to the tree; the base of the branch "hinged" at the cut mark, and the upper portion of the branch came to rest upon the high-voltage wire, thereby conducting electric current from the wire through the branch, the rest of the tree, Winesett, and the ladder. Winesett died from cardiac arrest caused by electrocution; he was survived by his widow (the administratrix), and three infant children.

McClennan estimated that before the branch was cut it was "about five feet or more" from the line at the closest point. As it lay across the top wire and parallel to the ground the branch was smoking. Measurements taken after the accident revealed that the trunk of the tree was 11 feet 6 inches from the closest point directly under the wires; a charred mark made where the ladder rested against the tree trunk was 21 feet 8 inches above the ground; a charred mark on the branch made where it touched the top wire was about 9 feet 5 inches from the point where the branch had been cut; the distance from the ground to the cut mark was 26 feet 8 inches; and the cut mark was approximately the same height as or a few inches higher than the top wire. The portion of the branch still attached to the tree was pointed in the direction of the top wire; and the cut portion of the branch was 17 feet 3 inches in length.

## I.  Contributory Negligence.

Vepco's primary negligence is not an issue on appeal. Vepco argues, however, that the evidence shows conclusively that Winesett was negligent, and that his negligence was a proximate cause of the fatal accident and therefore requires reversal of the judgment of the trial court and entry of judgment in favor of Vepco.

As a general rule, contributory negligence is a jury issue. *See Coleman* v. *Blankenship Oil Corp.*, 221 Va. 124, 129, 267 S.E.2d 143, 146 (1980). At trial, Vepco had the burden of showing by a preponderance of evidence contributory negligence on the part of Winesett. On appeal, however, Vepco has the heavier burden of showing "that there is no conflict in the evidence of contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole, sustaining the conclusion that . . . [plaintiff's decedent] was free of contributory negligence." *Va. Elec. & Power Co.* v. *Wright*, 170 Va. 442, 448-49, 196 S.E. 580, 582 (1938), *quoted with approval in Virginia E. & P. Co.* v. *Whitehurst*, 175 Va. 339, 346, 8 S.E.2d 296, 299 (1940).

Relying principally on *Smith* v. *Vepco*, 204 Va. 128, 129 S.E.2d 655 (1963), and *Watson, Adm'x* v. *Virginia Elec., Etc., Co.*, 199 Va. 570, 100 S.E.2d 774 (1957), Vepco contends that it carried its burden of proving contributory negligence as a matter of law. We disagree.

*Smith* and *Watson* are distinguishable. In each case, we affirmed the finding of contributory negligence as a matter of law made by the trial court. The plaintiff in *Smith* was a rod man on a surveying team. Smith testified that he was looking backward toward another member of the team and descending the side of a mountain when he was injured. His rod came in contact with an overhead electric transmission line carrying 44,000 volts. He admitted that he had seen the line and remembered that there was some conversation that day about what kind of line it was. He also recalled that he had talked with the men in his party about the danger of getting a rod into electric wires. In *Watson*, the plaintiff's decedent was electrocuted when a metal pipe that he was using to dig a well struck an uninsulated high-voltage power line almost directly overhead. The evidence showed that he had greater familiarity with electricity and its potential danger than the average person.

Vepco says that in the present case Winesett, as an intelligent person, was charged with the knowledge "that any line carrying electricity is dangerous." *Watson*, 199 Va. at 575, 100 S.E.2d at 778. Nevertheless, Vepco asserts, Winesett ignored the danger posed by the wires and proceeded to trim the maple tree in a negligent manner. Vepco presented evidence to show that professional tree trimmers in the exercise of reasonable care would have used ropes or protective clothing, would not have used a metal ladder, and would have undercut the branches to prevent them from "hinging" and thereby remaining partially attached to the tree. As stated by the trial judge, however, this type of evidence "defined the duty of someone who would have been actually engaged in this business" but did not necessarily establish what procedures would have been employed by a reasonably prudent "general handy man or repairman who had hired himself out to do this work."

■ We believe the present case is closely akin to *VEPCO* v. *Mabin*, 203 Va. 490, 125 S.E.2d 145 (1962), where we affirmed the ruling of the trial court that the plaintiff who was injured when he touched an overhead electric wire was not contributorily negligent as a matter of law. In that case, a high-voltage wire overhung a roof upon which the plaintiff was working. He crawled under the wire, which made contact with his back, and received a disabling injury from the electric current. We held that the crucial question was whether the plaintiff knew the wire "carried

high voltage electricity and was uninsulated and, therefore, dangerous." *Id.* at 492, 125 S.E.2d at 146. The evidence was conflicting and indeed the testimony of the plaintiff himself as to the extent of his knowledge was inconsistent. We held, however, that reasonable minds could differ as to the effect of the plaintiff's testimony, taken in its entirety, and that it did not establish contributory negligence as a matter of law. We concluded that the jury could have found from the evidence that the plaintiff had no special knowledge of electricity; that he did not know before the accident and should not necessarily have known that the wire was a high-voltage, uninsulated wire; that his contact with the wire was not caused by his voluntary and negligent act; and that he exercised due care in working near the wire. *Id.* at 494, 125 S.E.2d at 148.

The same rationale is applicable in the present case. The jury reasonably could have found that Winesett, who had only a ninth-grade education but was intelligent and possessed of common sense, was primarily employed as a painter, occasionally did odd jobs, and had no special knowledge of electricity. McClennan testified that he and Winesett had worked together as painters for three months prior to the accident. Carl stated that Winesett had painted his house "inside and out and [had also done] general work when we had things that possibly he could do." Winesett's brother, who operated an appliance repair shop, said that when Winesett had worked there, he made deliveries, picked up parts and installed air conditioners, washers, and dryers, but that he "knew very little about electricity" and had nothing to do with the electrical work associated with the installation of the appliances.

The jury reasonably could have inferred that Winesett did not know the top wire was a high-voltage uninsulated wire. The three lines were in plain view and Winesett and McClennan of course were aware of their presence. Considering McClennan's testimony in the light most favorable to the administratrix, however, the jury could have inferred that Winesett knew or should have known that the wires carried some electric current, but no more than the low voltage necessary to provide telephone service. The jury could have inferred in the alternative, as McClennan's testimony suggested, that Winesett believed that high voltage, if any, was carried into and through the residential neighborhood in the larger, insulated wires rather than in the smaller top wire. Therefore, the jury could have concluded that Winesett did not know, and had no

reason to know, that the lines presented any danger unless they were broken. Such a conclusion is supported by the evidence that one branch cut by Winesett brushed against the top wire without incident.

Vepco presented evidence that Winesett failed to meet the safety standards required of those who trim trees. Henry Faris, an expert employed by Vepco, testified to the manner in which duties should be carried out in compliance with a manual entitled "American National Standard Requirements for Tree Pruning, Trimming, Repairing or Removal (1973)." He conceded, however, that the manual requires experienced persons to warn inexperienced workmen that electric shock may be experienced when a tree worker makes either direct or indirect contact with an energized tree limb.

Vepco's supervisor of line clearance for the area in which the Carls' home was located also testified to the safety precautions required of his crews when working in trees. He explained the importance of using ropes or protective clothing, and of undercutting limbs to prevent them from "hinging." The jury reasonably could have found from the evidence, however, that Winesett was no more than an ambitious, self-employed house painter who supplemented his income by working at odd jobs, that he was inexperienced in tree work, and neither knew nor was expected to know the techniques required of tree workers employed by utility companies.

The trial judge, in overruling Vepco's motion to set aside the verdict, stated that the evidence of contributory negligence "was not so clear or overwhelming" that he could say "that the minds of reasonable men could not differ." We agree with this evaluation of the evidence and reject Vepco's contention that Winesett was contributorily negligent as a matter of law. *See Blackwell* v. *Hub Furniture Corp.*, 163 Va. 621, 625, 177 S.E. 64, 65 (1934).

## II. Proximate Cause.

The issue of proximate cause, like the issue of contributory negligence, is generally a jury question. *See Coleman* v. *Blankenship Oil Corp.*, 221 Va. 124, 267 S.E.2d 143 (1980); *S & C Company* v. *Horne*, 218 Va. 124, 235 S.E.2d 456 (1977); *Spence* v. *American Oil Co.*, 171 Va. 62, 197 S.E. 468 (1938). Vepco argues, however, that as a matter of law any negligence on its part in maintaining its distribution lines was not the proximate cause

of Winesett's death. Vepco relies on the principle stated in *Spence* that there is legal liability for negligence only where the injury complained of was " 'the natural and probable consequence of the negligence or wrongful act, and . . . ought to have been foreseen in the light of the attending circumstances.' " *Id.* at 73, 197 S.E. at 473 (quoting *Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 475 (1876)). Winesett's accident, Vepco says, was caused by his cutting a tree branch that posed no danger and violated no industry safety standard, so that any negligence of Vepco in failing to trim the tree was not the proximate cause of his death.

■ To establish proximate cause the plaintiff is not required to prove an injury was certain to occur as a result of the defendant's negligence; "it is [not] necessary . . . that the precise occurrence be foreseen." *VEPCO v. Savoy Const. Co.*, 224 Va. 36, 46, 294 S.E.2d 811, 818 (1982). Rather, the plaintiff must only show that "a reasonably prudent person under similar circumstances ought to have anticipated 'that an injury might probably result from the negligent acts.' " *Id.* (quoting *New Bay Shore Corp. v. Lewis*, 193 Va. 400, 409, 69 S.E.2d 320, 326 (1952)). Thus, reasonable foreseeability is sufficient; clairvoyance is not required.

■ There was evidence that Vepco was notified by Carl that the maple tree was growing across the power lines and possibly causing an electrical hazard. Vepco's local supervisor of line clearance agreed that it was Vepco's practice to investigate each problem reported by a customer and, if investigation revealed tree branches intermixed with Vepco wires, to trim the tree back to a clearance of ten feet.

The expert witness for the administratrix testified that the industry standard and accepted practice is to trim trees back to a ten-foot clearance, a procedure known as "sidewalling," whenever the trees contact the wires or "are potentially going" to contact them under adverse weather conditions. He described numerous safe alternatives, including insulation of the wire, which could be used if it was not practicable to maintain the required clearance. This witness was not aware of any reason why it would have been impracticable for Vepco to trim the maple tree prior to the date of the accident. Therefore, the jury could reasonably conclude that the branch constituted a safety hazard and violated industry and Vepco standards requiring a ten-foot clearance for the entire height of the tree.

Vepco argues that the evidence shows that all branches that were intermixed with the wires had been cut by Winesett before he cut the last branch which conducted the fatal electric current. Whether the evidence justifies this conclusion is not dispositive. There was evidence from which the jury reasonably could infer that before the last branch was cut it was overhanging the primary line. The expert for the administratrix was of this opinion. The jury could properly have found that Vepco should have anticipated that its failure over several months to take any action in response to a customer's report of wires in contact with tree branches might be followed by an attempt by the customer or his agent to trim the tree, that the person doing the work might not possess the expertise of its own professional tree trimmers, and that during this work a branch which overhung and came within five feet of its negligently maintained wires might be cut and a cautious but inexperienced worker injured.

A division construction supervisor for Vepco testified that when a tree limb comes in contact with a bare 7,200-volt primary line it may "feed [voltage] through the limb." Whether this occurs, he said, depends on how hard the limb "hits" the line. In view of the admitted knowledge of this danger, the jury reasonably could conclude that Vepco should have anticipated that an injury "might probably" result from its negligent failure to maintain a proper clearance around the wires.

The jury was instructed that Vepco had a duty to insulate high-voltage wires "at places where others . . . may reasonably be foreseen to go" but the duty was not absolute if the wires were maintained at such height or in such manner that it is not reasonable to foresee that people will come in contact with them.[2] As recited above, there was evidence that Vepco employees knew that contact with the wires could be made directly or indirectly through tree branches.

Thus, there was evidence that Vepco might reasonably have foreseen that if it failed to act upon Carl's warning of danger, its uninsulated high-voltage wire "might probably" cause injury to the landowner or anyone acting for him in trimming the tree. We cannot say that there was no evidence from which the jury reasonably could infer that Vepco's failure to maintain properly its primary line, by trimming the tree or insulating the wire, was the

---

[2] Vepco did not assign error to the giving of this instruction.

proximate cause of Winesett's death. We conclude that reasonable minds could differ and that proximate cause was a jury issue.

### III.   Assumption of the Risk.

■ Contributory negligence and assumption of the risk are concepts which occasionally overlap but are generally distinguishable. *Budzinski* v. *Harris*, 213 Va. 107, 109-10, 189 S.E.2d 372, 375 (1972). Contributory negligence connotes carelessness; assumption of the risk connotes venturousness in voluntarily incurring a risk the nature and extent of which are fully appreciated. *Amusement Slides* v. *Lehmann*, 217 Va. 815, 819, 232 S.E.2d 803, 805 (1977). As we have demonstrated, the evidence concerning contributory negligence was conflicting and inconclusive; thus this issue was properly presented to the jury. Vepco's final contention is that there was credible evidence from which the jury reasonably could have inferred that Winesett voluntarily assumed the risk of the accident and therefore the trial court erred in refusing to grant an instruction on this theory of defense.

■ Vepco recites Carl's testimony that he considered the limbs making contact with the wires to be a hazard to him when he was working in his yard. Carl told Winesett about the limbs touching the wires and he felt that Winesett understood his concern for personal health and safety. Carl, however, never directly discussed with Winesett the existence of the power lines and did not tell him about the sparking caused by branches striking the wires. Although Winesett had never done any tree work for Carl before, Carl accepted Winesett's assurances that he could do the job because Carl thought, from what Winesett had told him, that Winesett had prior experience in cutting trees "down in Virginia." There was no evidence that Winesett had any such experience.

McClennan's testimony contained certain inconsistencies which Vepco is entitled to have resolved in its favor as to assumption of the risk. Thus, McClennan at one point conceded that he knew the wires conducted electricity. But there is no evidence that he or Winesett knew that the exposed, uninsulated top wire was a dangerous, high-voltage line. It is clear from McClennan's testimony that he and Winesett were concerned only with danger that might result if a line were broken. The assumption of both men that Winesett had been shocked by a malfunction of the electric chain saw is significant. Neither attached importance to the partially cut branch falling across the top wire. McClennan had observed that

nothing happened when Winesett had earlier cut a branch which lightly struck a line. McClennan's unsuccessful efforts to rescue Winesett were inconsistent with any appreciation by either that the falling limb had created a highly hazardous condition.

Vepco says that from the testimony of its expert witness, Faris, the jury could have concluded that Winesett knew that a partially cut branch falling on the high-voltage line would kill him. It is true that Faris testified that a tree worker should be instructed as to the danger arising from a limb striking an electric line. There is no evidence, however, that Winesett had any such knowledge or had any familiarity with the safety manual on which Faris relied. Moreover, there is no evidence that Winesett was aware that any of the lines carried high voltage or that a partially cut branch striking the top wire would conduct electric current through the branch and ultimately into his body. We conclude that the trial court correctly ruled that there was no evidence that Winesett fully appreciated the nature and extent of the danger and deliberately chose to subject himself to the risk. We hold, therefore, that the court did not err in refusing the proffered instruction on assumption of risk.

For the reasons assigned, we will affirm the judgment of the trial court.

*Affirmed.*

COMPTON, J., dissenting.

Confronted by a glistening, bare power line, plaintiff's decedent, an adult of average intelligence who was perched on a metal ladder on a clear day, undertook to cut with an electric saw a limb overhanging the exposed wire. The majority has decided this is not contributory negligence as a matter of law which proximately caused Winesett's death. I cannot agree.

"It has long been recognized that the danger of electrical energy is a matter of common knowledge to all persons of ordinary intelligence and experience." *Watson* v. *Virginia Electric & Power Co.,* 199 Va. 570, 575, 100 S.E.2d 774, 778 (1957). The use of electricity has been so widespread for years that "all competent persons" are deemed to be acquainted "with the fact that any line carrying electricity is dangerous." *Id.* One need not be an electrical engineer to appreciate the danger inherent in a bare power line

in plain view, and the law does not require a defendant to establish sophisticated "special" knowledge, to use the majority's term, in order for a plaintiff to be found contributorily negligent as a matter of law.

Here, the evidence conclusively shows that Winesett possessed intelligence and common sense, had experience with electricity as an electrical appliance repairman, and should have been cognizant of the open and obvious danger presented by the wires intermixed with the tree limbs.

I am not persuaded that *VEPCO* v. *Mabin*, 203 Va. 490, 125 S.E.2d 145 (1962), is controlling. Under the evidence in *Mabin*, this Court held the plaintiff had the right to assume the power company had not placed a dangerous wire close to the roof on which Mabin was repairing a gutter. In the present case, in contrast, the very reason Winesett was hired to do the work was to alleviate an electrical hazard caused by the wires mixing with the tree limbs. Thus, he was not justified in assuming that the entangled wires presented no danger.

Accordingly, I would reverse the judgment below and enter final judgment for the defendant.

HARRISON, R.J., joins in this dissent.