Patricia C. GILLIS and Eugene B. Gillis,
as parents and next friends of Matthew
Gillis and Patricia Gillis and Eugene B.
Gillis, Individually,

v.

UNITED STATES of America.

No. 87–833–Civ–J–12.

United States District Court,
M.D. Florida,
Jacksonville Division.

July 10, 1989.

As Corrected July 17, 1989.

Rodney Margol and C. Rufus Pennington, III, Margol & Pennington, P.A., Jacksonville, Fla., for plaintiff.

Dorothea Beane, Asst. U.S. Atty., Jacksonville, Fla., for defendant.

## MEMORANDUM

MORTON, Senior District Judge.

### I. Introduction

This is a medical malpractice action brought against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* The plaintiffs, Matthew Gillis and his parents, Patricia and Eugene Gillis, seek damages from the United States as compensation for allegedly causing the various neurological problems from which Matthew suffers today. The plaintiffs allege that the United States, acting through Portsmouth Naval Hospital in Portsmouth, Virginia, negligently injured Matthew during his birth on May 17, 1981. More specifically, the plaintiffs contend that Matthew experienced fetal distress prior to delivery; that this fetal distress and accompanying deprivation of oxygen caused Matthew's present neurological problems; that the defendant would have discovered the distress earlier but for inadequate fetal heart monitoring; and that adequate monitoring would have resulted in intervention in time to prevent the neurological injuries. In accordance with the following findings of fact and conclusions of law, the court finds in favor of the defendant.

It is undisputed that the defendant had the duty to adequately monitor Matthew's fetal heart rate after Mrs. Gillis' arrival at the hospital. No other duty or breach of duty is at issue. Thus, the first question is whether Matthew's fetal heart rate was adequately monitored. If it was, there can be no liability because there would be no breach of duty. On the other hand, if the fetal heart rate was not adequately monitored, the court must find that there was a breach of duty, and it must then consider whether this breach proximately caused Matthew's present neurological condition. There is no dispute that Matthew does in-

deed have some neurological problems. However, both the severity and cause of these problems are hotly contested. Additionally, the evidence concerning whether Matthew's fetal heart rate was adequately monitored is in great conflict. First, there is contradictory and confusing evidence concerning exactly what happened during the several hours prior to Matthew's eventual delivery by an emergency caesarean section. The confusion is enhanced by memories having faded by the passing of almost eight years. Second, there is significant disagreement over the appropriate standard of care in May 1981. However, the parties do agree that Virginia law applies to this question, and Virginia law states that the standard "shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in [Virginia]." Va. Code Ann. § 8–01–581.20.

## II. No Breach of Duty

■ Some facts are not in dispute. On May 17, 1981, Patricia Gillis was pregnant and ten days past her due date. Matthew, the child eventually born on this day, was Patricia's third child, but apparently the first with Eugene as the biological father.[1] At sometime during the afternoon of May 17, Patricia began experiencing labor contractions. The subsequent chronology of events until about 10:30 p.m. is in question. At approximately that time, the yet unborn baby was diagnosed as experiencing fetal distress. After immediate ordinary efforts to relieve the distress were unsuccessful, the hospital decided to perform a caesarean section. Matthew was then delivered at 11:12 p.m. The plaintiffs find no fault with the attempts to relieve the fetal distress once discovered. Neither do the plaintiffs object to anything about the caesarean section itself. Rather, the plaintiffs simply contend that the defendant should have discovered the distress earlier, thereby allowing an earlier caesarean section which in turn would have allegedly prevented

Matthew's neurological problems. Thus, the court must determine whether the defendant's failure to discover the fetal distress earlier was a result of inadequate monitoring. This requires reconstruction of the events leading up to the discovery of the fetal distress.

Mrs. Gillis claims that she initially arrived at the hospital around 4:15 or 4:30 p.m. She says that she was examined by a Dr. Gray at this time and was then told to leave for a while. According to Mrs. Gillis, she returned to the hospital about two hours later after walking in a park. As she was getting to the labor area, she experienced a flow of clear fluid which she assumed to be her water breaking, and she reported it as such. Next, Gillis states, a nurse put her directly in bed. The time given for this is approximately 7:30 p.m. Then, Mrs. Gillis' story continues, she was completely ignored in this room until 10:30 p.m., at which time she was able to get the attention of a Dr. Nelson who entered the room, initiated monitoring, and then discovered fetal distress.

Mrs. Gillis denies ever reporting that her water broke at 8:45 p.m. She also denies receiving any Mylanta at 9:00 p.m. She also denies being examined or questioned by a nurse at around 9:00 p.m. She also denies some subsequent examination by a doctor between 9:00 and 9:40 p.m. She also denies receiving an enema, and consequently denies being in the bathroom for a while or eventually being helped back to bed. She further denies that any nurse placed an external monitor on her before Dr. Nelson finally entered the room at around 10:30 p.m. In short, Mrs. Gillis asserts that she was not given any care, any treatment, or any attention during the three-hour period from 7:30 to 10:30 p.m. If Mrs. Gillis' story is correct, this court would have to conclude that the hospital breached its duty of care. However, in order to reach this conclusion, the court would also have to conclude that various

1. This finding is based on testimony and documents which show that Patricia's other two children are male, and on testimony by Eugene that Matthew is his only son. While not extremely significant, this fact is relevant to the

extent that the plaintiffs seek to weaken genetics as a possible cause of Matthew's problems by pointing out that none of the other children experienced similar problems.

hospital employees conspired to falsify hospital documents as a cover-up for their negligence. Too many documents show that Mrs. Gillis did receive attention. And the court finds that these documents were not falsified. True, some portions of the documents are ambiguous, and the brevity of some remarks does not help matters, but one must remember that these documents were not created for the primary purpose of minutely detailing all relevant events for a lawsuit almost eight years later. They are, nevertheless, strong evidence of the unreliability of Mrs. Gillis' claim.

Based upon testimony and hospital records, the court finds that Mrs. Gillis presented herself to the hospital, probably for the second time that day, at approximately 8:45 p.m. or a little later. Upon presentment, she informed the nurse that her water had just broken, and Nurse Corazon Miranda consequently recorded that SROM (spontaneous rupture of membranes) occurred at 8:45. Miranda also recorded other historical information provided by Mrs. Gillis. Expecting Gillis to be admitted, Miranda also gave the expectant mother Mylanta at approximately 9:00 p.m. Around this time Miranda may also have checked the fetal heart rate, but whether she actually did at this time is not of critical importance since the patient had just presented herself, was not yet admitted, and was going to be examined by a doctor in a matter of minutes. Furthermore, the court finds that the fetus was not in distress at this time.

After Miranda evaluated the patient, she presented the case to an available doctor who happened to be Dr. Gray. In Miranda's presence, and before Gillis was ever put in her room, Dr. Gray examined Gillis sometime between 9:00 and 9:40 p.m. It was probably closer to 9:40, and Miranda's own evaluation and questioning was probably not completed until sometime after 9:00 p.m.

Following his examination of Gillis, Dr. Gray discussed his evaluation with a Dr. Chao, and then proceeded to write instructions to the nurse at 9:40 p.m. Among other things, the doctor gave the formal instruction to admit the patient. The doctor also ordered the patient to be given an enema and to be placed on electronic monitoring. The same document giving this instruction also contained a notation of a stable condition. The court finds that this notation was a conclusion reached from a physical examination of Mrs. Gillis. The court also specifically finds that the examination included a check on the fetal heart rate. While this may or may not have been the "118" which appears on other documents, the court finds that the rate was normal and gave no cause for alarm.

Within approximately five minutes, Dr. Gray recorded some "progress notes" which were also based upon his recent examination of the patient. Just as did the "orders" to the nurse, the progress notes reveal Dr. Gray's decision to have an enema given to the patient. Interestingly, the progress note also records that the patient's water had not broken. Obviously this contradicts the mother's story, but the court is satisfied that reasonable explanations were given for how either the doctor or the patient could have been mistaken. As a general rule, whether or not the water had broken might be a relevant factor indicating the need for increased frequency of fetal heart monitoring, but other findings of the court render the question relatively insignificant in this case.

Specifically, the court finds that very soon after Dr. Gray issued his orders at around 9:40 p.m., Nurse Miranda began preparing the patient for an enema and subsequently administered the enema. By 10:00 p.m., Miranda's role in administering the enema was completed and Mrs. Gillis was in the bathroom. At this time, Miranda stopped to record that the patient had been admitted and that the fleet enema had been given.

The court finds that Mrs. Gillis finished expelling the enema shortly before 10:30 p.m. She then walked to her room, perhaps with Miranda's assistance and at least with Miranda's accompaniment. Miranda then put Gillis in her bed and attached an external electronic fetal heart rate monitor. The printout from this monitor revealed

that the baby was experiencing late deceleration. Whether detected by Miranda or by Dr. Nelson, the problem was identified almost immediately after the external monitor was placed on the patient. Thus begins the attempts, briefly described earlier, to intervene in the delivery. As also noted earlier, the plaintiffs object to nothing which occurred after this time.

Before Mrs. Gillis was placed on the external monitor shortly before 10:30 p.m., Matthew's fetal heart rate had not been monitored since Dr. Gray's examination not long before 9:40 p.m. However, the vast majority of this time gap was consumed by the enema process. For reasons which some might deem obvious, the fetal heart rate was not monitored during preparation for, administration of, and evacuation of the enema. The court also finds that failure to monitor during this time was not outside the standard of care.

True, there was testimony that the standard of care required monitoring at least every 30 minutes. Of course, there was also evidence that a much greater time was within the standard of care. Nevertheless, while the court might be inclined to find that 30 minutes is the appropriate standard as a general rule, the court need not specifically make such a finding because there was also convincing evidence that the standards are flexible, general guidelines. The court accepts this evidence as true. The standard is not a rigid one, but rather one which adjusts according to the circumstances and the perceived needs of a particular patient, hospital, or situation. Assuming 30 minutes to be the general standard, the court specifically finds that 30 minutes is not the standard during the time surrounding the giving of an enema. Rather, the standard relaxes to accommodate the enema without requiring monitoring during the enema process unless there are circumstances absent in this case which indicate a special need for monitoring.

The court also finds that the enema process began so shortly after Dr. Gray's examination that there was no breach of duty by failing to monitor between the end of Gray's examination and the beginning of the enema process. Further supporting this conclusion is the fact that Mrs. Gillis was less than four centimeters dilated at the time of Gray's examination. The ordinary policy of the hospital was to not even admit the patient until she reached four centimeters. One of Gray's notes simply indicated that the patient was expected to have reached this point by the time of the enema.

Likewise, the court finds that there was no breach of duty for failure to monitor after the enema. The monitoring was as prompt as possible after Mrs. Gillis finished expelling the enema. Furthermore, this was continuous electronic monitoring which is even better than manual external monitoring. Indeed, the hospital's ordinary practice was apparently to use continuous electronic monitoring rather than intermittent monitoring at anywhere from 15 to 60-minute intervals. The only reason Gillis had not been placed on the electronic monitor at an earlier time is that the enema consumed virtually all of the time between Gray's examination and eventual application of the monitor. There was no sense in delaying the enema process by placing Gillis on the monitor very soon after the physical examination, only to almost immediately remove the monitor in order to give the enema. In sum, the court concludes that the hospital's monitoring of Mrs. Gillis conformed with the appropriate standard of care. Thus, since there was no breach of duty, the plaintiffs' claim must be dismissed.

### III. No Causation

■ Even if the defendant had breached its duty to adequately monitor Matthew's fetal heart rate, the court would still reject the plaintiffs' claim for lack of causation. While admittedly a very close question, the court finds that the plaintiffs failed to meet their burden of proving that Matthew's fetal distress and associated deprivation of oxygen factually caused Matthew's present neurological problems.

The court finds that Matthew did experience serious fetal distress. Basically, the problem was a reduced flow of oxygen to Matthew just prior to his birth. The court

finds that the distress began sometime between Dr. Gray's examination and the application of the external monitor around 10:30 p.m. However, as so convincingly explained by Dr. John Freeman, a pediatric neurologist from Johns Hopkins University, not all deprivations of oxygen result in permanent injury. In this case, the court accepts Dr. Freeman's conclusion that Matthew's present neurological problems were most likely not caused by any deprivation of oxygen experienced just prior to birth.

In attacking Dr. Freeman's testimony, the plaintiffs point out that Freeman originally thought thin or faint meconium was present at birth. The plaintiffs correctly assert that the meconium was thick rather than thin, but the court fails to attach any great significance to this fact as it relates to the issue of causation. First of all, the meconium is only relevant if the fetal bowel movement was stimulated by the lack of oxygen. There can be other explanations for the presence of the meconium or bowel movement, but the court finds that the movement in this case was stimulated by the oxygen deprivation. Accepting this as true, the fact that the meconium was thick simply means that there had not been time for dilution, thus indicating that the distress occurred shortly before delivery. Thin meconium would have been a sign that the distress occurred some hours before delivery. However, whether it occurred hours before or shortly before delivery says very little about whether the distress caused Matthew's current neurological problems. The time of occurrence actually relates more to the question of wheth-

er there was negligent conduct, an issue already addressed.

Likewise, the court does not find the weight of Dr. Freeman's testimony to be fatally impaired by his original impression that the baby's blood gases were not tested. The court finds that the defendant attempted to test blood gases, but it does not find that results were obtained. Dr. Nelson testified that at the time in question, blood gas testing was just being introduced, and it was not the standard of care. He also testified that the hospital was often unable to get results from testing attempts at that time because of the crudeness of the initial equipment. The court suspects this explains the absence of any document showing the blood gas testing results despite the documentation of two attempts to draw blood. Nevertheless, even if results had been obtained, and even if they indicated a serious lack of oxygen, this fact would not destroy Dr. Freeman's conclusion. This court is convinced oxygen deprivation occurred. It just does not believe that the deprivation caused Matthew's permanent neurological condition. The court accepts Dr. Freeman's testimony that other symptoms or conditions would have manifested themselves at or soon after delivery if the oxygen deprivation had permanently damaged the brain. Those other symptoms or conditions being absent, the court finds that the oxygen deprivation did not cause Matthew's present neurological problems.[2]

It is important to note that the weak link in the plaintiffs' proof of causation is factual causation, not the "proximate" or "legal" aspect of causation. The issue of

---

**2.** These same conclusions dictate rejection of the plaintiff's assertion that the "missing" blood gas results should shift the burden of proof on causation to the defendants. First, the court does not believe there were any results, and since blood gas testing was not the standard of care, the defendant cannot be held accountable for the failure of the equipment to get results. Second, even if there were results, they are such a minor part of the causation picture that a good faith failure to provide the results eight years later does not justify a shifting of the whole burden of proof concerning causation. Their absence might allow for a presumption of bad results, but not a presumption of causation.

Additionally, the court notes that the advisory note to Rule 302, relied upon by the plaintiffs, states that "application of state law is called for only when the presumption operates upon [a substantive] element" of the claim. Whether or not Matthew was deprived of oxygen is not a substantive element of the claim. *Valedon–Martinez v. Hospital Presbiteriano*, 806 F.2d 1128 (1st Cir.1986) is therefore distinguishable. In *Valedon–Martinez*, the voids in the hospital record were directly relevant to conduct which may or may not have been a breach of the duty of care. Thus, application of state law regarding presumptions was appropriate. It is not appropriate in the case at bar.

proximate or legal cause relates to whether a cause is too remote or indirect or unforeseeable to hold a person liable for an act even if the act did fatally cause, however remotely, a subsequent injury. This question of foreseeability does not even arise if there is no factual causation.

If negligence and factual causation had been shown in this case, the court would have no trouble finding that the negligence was also the proximate cause of the injury because "a reasonably prudent person under similar circumstances ought to have anticipated 'that an injury might probably result from the negligent acts.' " *See Virginia Electric & Power Co. v. Winesett,* 225 Va. 459, 303 S.E.2d 868, 874 (1983). *See also Virginia Electric & Power Co. v. Savoy Construction Co., Inc.,* 294 S.E.2d 811, 818 (Va.1982). Certainly any hospital should anticipate that permanent neurological harm could result from prolonged deprivation of oxygen. The mere fact that a hospital should anticipate such injury, however, does not mean that such injury did occur. Accordingly, the court rejects the plaintiffs' apparent argument that they need show *only* that the reasonably prudent person under similar circumstances ought to have anticipated that an injury might probably result from the negligence, assuming arguendo that there was negligence. True, that is all they need show to establish the "proximate" aspect of causation, but they must first show factual causation by a preponderance of the evidence. Having failed, their claim must fail. The *Virginia Electric* cases were addressing proximate causation. They were in no way relaxing the ordinary burden of proof concerning factual causation.

Similarly, the ordinary burden of proof on this issue is in no way altered by *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985) and *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966). The plaintiffs quote the following provision from *Brown:*

Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing death.

They also quote from *Hicks* as follows:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

The court has no problem with the plaintiffs' argument that these same principles apply to all medical malpractice cases, including the one at bar. However in *Brown* and *Hicks,* the causal link between a past medical problem and a present condition were never in question. *Hicks* and *Brown* involved a present condition of death which was undisputably factually caused by a medical problem existing at the time of treatment or lack of treatment by the defendants. The question was whether the defendants were responsible for the present condition because of their negligent handling of the medical problem. In addressing this question, both courts held that the plaintiffs were not required to prove to a certainty that the medical problem would not have caused the present condition if the defendant had intervened appropriately. Rather, the plaintiffs only needed to show that the defendants had destroyed a substantial possibility that the present condition would not occur. The courts said nothing about the direct link between the medical problem and the present condition because that link had been conceded. Rather, they were dealing with whether the defendants should be re-

 

sponsible for that link because of the link between the defendants' conduct and the medical problem.

In the case at bar, the problem is the link between the present condition (neurological deficits) and the past medical problem (fetal distress or deprivation of oxygen). Assuming negligence, the difficulty is not the link between the negligent conduct and the past medical problem. In other words, the problem is not whether the defendant would be held responsible for the present condition because of the defendant's negligence, if indeed there was negligence. Assuming negligent monitoring and oxygen deprivation which caused the medical condition, the court follows *Brown* and *Hicks* and holds that the plaintiffs need not prove to a certainty that the Matthews' present condition would have been prevented had the fetal distress been detected earlier through more frequent monitoring. Rather, the plaintiffs need only show that the failure to adequately monitor destroyed any substantial possibility of intervening quickly enough to prevent neurological injury. The court finds that the plaintiffs did show this if they also showed that the oxygen deprivation just prior to birth caused the present condition. However, the court finds that the plaintiffs did not show that the present condition was caused by the oxygen deprivation. Accordingly, the link between the defendant's conduct and the past medical problem is irrelevant.

To restate, there are two links in the chain of causation. The first is the connection between the present condition and the past medical problem. The second is the link between the defendant's conduct and the past medical problem. The defendant's conduct is connected to the present condition only through its relation to the past medical problem. Thus, when the first link is missing, the defendant cannot be held responsible for the present condition regardless of how negligent its conduct may have been. In this case, the first link is absent, therefore there can be no liability. Of course, the court is not holding that the plaintiffs had the burden of proving the causal link between the present condition and the past medical problem to a certain-

ty, but they did have the burden of proving such causation by a preponderance of the evidence. This burden not having been met, this case is dismissed.