# Richmond

## VIRGINIA ELECTRIC AND POWER COMPANY

### V.

## SAVOY CONSTRUCTION COMPANY, INC.,

Record No. 800565.

September 9, 1982.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

*John Charles Thomas (R. Kenneth Wheeler; Stephen T. Gannon; Hunton & Williams,* on briefs), for appellant.

*Philip J. Walsh (Randell Hunt Norton; Macleay, Lynch, Bernhard, Gregg & Attridge,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Savoy Construction Company, Inc. (Savoy), initiated this tort action against Virginia Electric and Power Company (Vepco), for property damage. Savoy's motion for judgment alleged that the Arlington County Pollution Control Plant, which was being constructed by Savoy as general contractor, was damaged in an explosion and fire resulting from Vepco's negligence. Savoy sought

to recover damages for repairs it had been required to make under its contract with Arlington County. Denying liability, Vepco counterclaimed for damage to its equipment allegedly caused by Savoy's negligence.

In a jury trial, the jury returned a verdict for Savoy against Vepco in the amount of $441,656, with interest from October 4, 1979, and a separate verdict against Vepco on its counterclaim. Denying Vepco's motion to set aside the verdict and enter judgment in its favor or in the alternative to grant a new trial or order a remittitur, the trial court entered judgment on the verdict.

The explosion and fire occurred about 4:00 a.m. on September 23, 1976, when the project was approximately two weeks from completion. County employees engaged in "testing and start-up" operations were already occupying the property and Vepco had energized the electrical system some nine months before the explosion. Extensive damage resulted to the Motor Control Center room in the Chlorine Building, the manhole vault outside the building, Vepco's transformer located several hundred feet from the manhole, asbestos cement conduits extending underground from the transformer to the manhole and from the manhole to the Motor Control Center, and the electrical cables running through certain of the conduits. Steel doors in the Motor Control Center were blown off their hinges, and the manhole cover over the manhole vault was found broken into two pieces several feet from the manhole.

The only eyewitness, a workman at the plant, saw the lights grow dim twice and then go out. He heard explosions and observed blue flames coming from the Chlorine Building and the transformer house. Another plant employee had left the Chlorine Building about three minutes before the explosion. With this paucity of direct evidence, the cause of the catastrophe was the subject of conflicting theories advanced by expert witnesses who had investigated the occurrence for the litigants.

Savoy's theory was that Vepco's crew had torn the insulation on electrical cable while installing the cable in the conduits between the manhole vault and the transformer; that Vepco failed to use a routine test to detect the damage to the insulation; that one or more electrical arcs resulted from the torn insulation; that the insulation was burned at high temperature, causing hydrogen gas to form; that the gas moved along the conduits to the Motor Control Center where it mixed with oxygen and exploded; and that other

explosions followed. Vepco's theory was that the explosions were caused by methane gas arising from effluent in the plant and from decayed vegetation in the nearby swampy, marshy ground; that the gas was ignited by an arc in the Motor Control Center and exploded; and that another explosion occurred in the manhole vault, and probably another in the transformer, but that no explosion would have occurred if Savoy had plugged and sealed the ends of the conduits either in the manhole vault or in the Motor Control Center.[1]

The uncontradicted evidence established that the conduits between the Chlorine Building and the transformer had been installed by Savoy and Singleton Electric Company, a subcontractor. A manhole vault was constructed outside the Chlorine Building. In late 1975 or early 1976, Vepco installed electrical cable in three of the eight conduits between the transformer and the manhole vault; Singleton installed the cable between the manhole vault and the Motor Control Center. The other conduits remained empty. The cable installed by Vepco was secondary cable, which is cable carrying voltage reduced by the transformer. At the manhole vault, Vepco connected its cables to those used by Singleton, conducted a test to determine that the cables were properly connected, and energized the system.

Vepco's cable foreman, Thomas J. Harris, called as a witness by Savoy, testified that he was in charge of a six-man crew that installed the electrical cables in the conduits. He outlined in detail the procedures used in pulling the cables through the conduits. In summary, each conduit was first brushed clean before the cable was pulled through by means of a winch powered by a Vepco truck; the cable was inspected as it was fed into the conduit and was greased to make it slide more easily. Because the conduits were made of a rough, porous substance causing more friction on the cables, extra lubricant was applied to the cables as they were laid.

Harris noticed during the installation that the cable pulled "tighter" than he expected, and he reported this to a representative of Arlington County who explained to the foreman's satisfaction that there were three ninety-degree turns in the conduits. Harris acknowledged that cable can be damaged if pulled too

[1] There was evidence that in this context a plug is a cap or wooden plug fitted into the end of an empty conduit, and a seal is either a bushing or a putty-type compound used at the end of a cable-bearing conduit.

hard. He also was familiar with a Megger[2] test used to determine faults in cable insulation. Vepco had the necessary equipment for a Megger test. Harris knew how to perform the test, but seldom did so, and he did not use it in this installation.

George DeSocio testified as an expert witness for Savoy. From his examination of tears and corrosion in the damaged cable insulation, he was of opinion that an electrical arc resulted from damage to the cable during its installation by Vepco; and that the arc produced temperatures high enough to decompose the cable insulation, creating hydrogen gas which passed through the conduits, became mixed with oxygen, and exploded. DeSocio stated that the fault in the cable would have been discovered by use of a Megger test, and that it was standard practice among utilities to use such a test. Glenn H. Damon, another expert witness called by Savoy, was of the same opinion as DeSocio as to the cause of the explosion.

The evidence for Vepco was that Vepco did not use a Megger test on secondary cable because it was ineffective as well as uneconomical, that utilities in the area did not use the test, and that the standard practice was not to use it on secondary cable. Uncontradicted evidence established that neither the ends of the conduits entering the Motor Control Center from the manhole vault nor those entering the manhole vault from the transformer were plugged or sealed. The evidence was also uncontradicted that the manhole cover over the manhole vault did not have any holes in it, although Savoy was required to provide a manhole cover with two one-inch holes.

Kenneth R. Cobb, testifying as an expert witness for Vepco, described the safety features in the electrical system. He found it significant that the conduits had not been sealed as, in his opinion, was required by good engineering practice and the National Electric Code.[3]

Leonard C. Mandell, another expert witness testifying for Vepco, was of opinion that the first explosion occurred when an accumulation of methane gas arising from effluent in the plant and decay in the soil ignited. He testified that if the conduits had

---

[2] A Megger is defined as a "high-range ohmmeter commonly used as a portable instrument for measuring the high resistance of electrical insulating materials . . . . " 8 McGraw & Hill Encyclopedia of Science and Technology 270 (1977).

[3] It was stipulated at trial that the National Electric Code has been adopted by statute in Virginia.

been plugged and sealed, as good workmanship required, there would have been no explosion. Moreover, Mandell testified that holes in the manhole cover would have permitted gas to vent and thereby lessen the chance of explosion, although he conceded that such a manhole cover could be blown off in an explosion.

Robert S. Cook, Chief Electrical Inspector for the consultants employed by Arlington County to inspect the construction as it progressed, testified as a witness for Vepco. He said that three times before the explosion he had instructed Savoy either orally or in writing to comply with Vepco specifications by putting holes in the manhole cover. Cook also testified that under the conditions prevailing at the job site, where there was a "high water table," the conduits should have been plugged and sealed in accordance with normal practice in the industry. He had placed the plugging and sealing of conduits on his preliminary "punch list" dated October 21, 1975, and in subsequent punch lists he had requested that all items on previous lists be completed.

In rebuttal, Savoy introduced the testimony of Joseph Sheridan, foreman for Singleton, who stated that it was normal practice in the electrical contracting industry to seal conduits only before turning a construction project over to the owner. According to Sheridan, compliance with the National Electric Code, which requires the sealing of conduits, is usually provided by the final punch list for the project. In this instance, the final punch list had not been prepared and the project had not been tendered to Arlington County. Damon, recalled by Savoy as another rebuttal witness, testified that in his opinion the gas pressure generated in the conduits was so high that seals would have blown out rapidly and would have made "very, very little difference." He further asserted that two one-inch holes in the manhole cover would have had a "slight effect" but would not have prevented the explosion.

Vepco sought to introduce in its entirety the contract between Arlington County and Savoy to show that the contract specifications required Savoy to seal the ends of conduit runs immediately after installation by means of paraffin-impregnated wooden plugs or other approved means. The trial court declined to admit the contract on the ground that Vepco was not a party to it. Nevertheless, the provisions requiring the sealing of conduits were elicited on cross-examination of one of Savoy's witnesses and read into evidence as part of his deposition. At the conclusion of the evidence, however, the trial judge informed the jury that the con-

tract did not apply except for one provision "drawn with Vepco in mind as a third-party beneficiary of the contract." The contract requirement that the manhole cover meet Vepco specifications by containing two one-inch holes was applicable to establish the standard only for that item.

The trial judge also informed the jury, at the conclusion of the evidence, that the provisions of the National Electric Code requiring the capping and sealing of conduits were not applicable until the project was "offered for acceptance" to the owner. We disagree with this statutory construction.

The General Assembly, by Chapter 829 of the Acts of 1972 (Code §§ 36-97, *et seq.*), directed the State Board of Housing[4] to promulgate a Uniform Statewide Building Code (Building Code). Code § 36-99 provided in pertinent part as follows:

The Building Code shall prescribe standards to be complied with in the construction of buildings, and the provisions thereof shall be such as to protect the health, safety and welfare of the residents of this State . . . .

Pursuant to this statutory mandate, the Board adopted the first Building Code in 1973. As adopted, the Building Code incorporated by reference the 1971 National Electric Code (NEC) of the National Fire Protection Association and various other codes pertaining to building, mechanical, and plumbing standards. The 1971 NEC, in effect until February 7, 1976, when the Board replaced it with the 1975 NEC, contained this provision:

*230-33. Raceway Seal.* Where a service raceway or duct enters from an underground distribution system, the end within the building shall be sealed with suitable compound so as to prevent the entrance of moisture or gases. Spare or unused ducts shall also be sealed.

Responsibility for enforcement of the Building Code was assigned to local building officials. Code § 36-105. Violations constitute misdemeanors punishable by fine. Code § 36-106. The Building Code itself provided in § 111.1 for inspections from time to time during the progress of the work and upon the completion of

---

[4] Now the Board of Housing and Community Development. Acts 1977, c. 613.

construction, and authorized in § 123.1 the use of stop-work orders to terminate violations.

The rationale of the trial court was that the project was still under construction until presented to the owner for acceptance and that if a contractor were arrested on a charge of violating the statute he could successfully defend on the ground that he had not completed his work. In his written opinion of January 2, 1980, pertaining to Vepco's motion to set aside the jury verdict, the trial judge amplified his reasoning. Acknowledging that the requirement that conduits be sealed was remedial in the sense that its purpose was to "protect users of the building and the property therein from injury," the judge nevertheless stated that the Building Code was penal and must be strictly construed. He ruled that its "thrust is the safety of ultimate construction and not of job site safety for County employees test-running unacccepted construction." He distinguished *Segaloff* v. *City of Newport News*, 209 Va. 259, 163 S.E.2d 135 (1968), on which Vepco relied, on the basis that in the present case the work had not been completed. In *Segaloff*, the city obtained an injunction, upheld on appeal, requiring removal of a canopy erected in violation of the local zoning ordinance.

■ A penal statute must be strictly construed, *Rollins* v. *Gordonsville*, 216 Va. 25, 215 S.E.2d 637 (1975), and violation of the Building Code may result in criminal sanctions. We agree with the trial judge that one of the important purposes of the Building Code is to provide for "the safety of ultimate construction." We perceive, however, that another important purpose of the part of the Building Code with which we are now concerned is to enhance the safety of those working on the project and, indeed, the safety of the project itself. The dominant purpose of the Building Code, therefore, is to provide comprehensive protection of the public health and safety. We must construe the Building Code broadly enough to give substantial effect to this manifest legislative purpose without disregarding its penal effects. *See* 3 *Sutherland Statutory Construction* § 59.05, at 16-17 (4th ed. C. Sands 1974).

■ Savoy concedes that the provisions of the Building Code apply at any stage during construction to any work that has been done. Following the reasoning of the trial court, however, Savoy asserts that in this case, because none of the work of plugging and sealing the conduits had been performed, there was no violation of

the Building Code. We do not accept this as a valid basis for distinction. Such a theory would give even a dilatory or recalcitrant builder the power to postpone with impunity the applicability of crucial safety requirements.

There must be compliance with the Building Code not only when work is performed but also when work required by the Building Code should be done to safeguard persons and property. Compliance only upon completion of the entire project in many instances may be sufficient, but earlier compliance is necessary where danger may arise from delay in the performance of required work. Specifically, we hold that the requirement that conduits be plugged and sealed was applicable when the conduits were completed, the cables were installed, and the system was ready to be energized.[5] To hold otherwise would be to leave at risk unnecessarily some of those very persons and the property that the statute was intended to protect.

As the evidence is uncontradicted that the conduits were not plugged and sealed by Savoy before Vepco energized the system, Savoy was in violation of the Building Code as a matter of law. The evidence further shows that Vepco was within the class of persons the Building Code was designed to protect and that explosion and fire were dangers it was designed to prevent. Accordingly, Savoy was negligent per se in failing to plug and seal the conduits. *See Farrish* v. *VanFossen*, 212 Va. 815, 816, 188 S.E.2d 201, 202-03 (1972); W. Prosser, *The Law of Torts* § 36, at 200-01 (4th ed. 1971). Vepco was entitled to have the jury so instructed. The instruction proffered by Vepco, after the trial court had ruled adversely to it as to the time when the statute applied, would have improperly required the jury to decide two questions of law: whether Savoy's failure to cap and seal the conduits was a violation of the Building Code and whether Vepco was one of those for whose protection the statute was designed. Vepco was entitled to an instruction properly drafted which would have left to the jury the question whether the negligence per se of Savoy was a proximate cause of the explosion and fire. The question of proximate cause was a jury issue because of the evidence of Savoy, contradicting that of Vepco, that the capping and sealing would not have prevented the explosion.

---

[5] This holding makes it unnecessary for us to decide whether the trial court erred in ruling that the contract specifications as to plugging and sealing conduits could not be considered by the jury.

■ We reject Vepco's argument that there was no evidence of primary negligence on its part sufficient to make a jury issue. Savoy's evidence that the explosion was caused by a fault in the cable insulation, that Vepco's foreman found unusual difficulty in pulling the Vepco cables through the conduits, and that Vepco failed to perform a Megger test to determine the integrity of the insulation was sufficient to go to the jury on primary negligence.

■ Vepco's argument that Savoy may not recover because it failed to show the foreseeability of the accident is without merit. Foreseeability is relevant to a determination of proximate cause. A negligent defendant is not liable for consequences which could not be expected to happen. *Tullock* v. *Hoops*, 206 Va. 665, 669, 145 S.E.2d 152, 155 (1965); *Fowlkes* v. *Southern R. Co.*, 96 Va. 742, 32 S.E. 464 (1899). For a defendant's negligence to be the proximate cause of an injury, however, it is necessary not that the precise occurrence be foreseen, but only that a reasonably prudent person under similar circumstances ought to have anticipated "that an injury might probably result from the negligent acts." *New Bay Shore Corp.* v. *Lewis*, 193 Va. 400, 409, 69 S.E.2d 320, 326 (1952); *Scott* v. *Simms*, 188 Va. 808, 817-18, 51 S.E.2d 250, 254 (1949).

■ Harris, the Vepco cable foreman, was aware that the cable was pulled through the conduit with difficulty. Vepco failed to test for insulation integrity though it had the capability to do so. From this evidence, the jury could reasonably conclude that Vepco employees, in the exercise of reasonable care under the circumstances, should have foreseen that the cable insulation might have been damaged in installation. There was also evidence that arcing and short-circuiting are not unusual consequences of faulty insulation. Moreover, as Vepco's expert conceded, in the high temperatures produced by arcing, cable insulation breaks down into explosive gases. We cannot say, therefore, that there was insufficient evidence of foreseeability by Vepco of the probability of a dangerous occurrence resulting from the installation of damaged cable insulation to make out a jury issue on proximate cause.

■ Vepco also contends that it could not be found negligent by its failure to perform a Megger test on the cable insulation because it was not required to take such an extraordinary precaution. We disagree. Although the evidence showed that it was Vepco's practice not to perform a Megger test on secondary cable, there was evidence adduced by Savoy that such a test should have

been used in conformity with sound engineering practice. The jury could have found that in the exercise of reasonable care under the circumstances Vepco should have used such a test and was negligent in failing to do so. *See Northern Virginia Power Co.* v. *Bailey*, 194 Va. 464, 468-70, 73 S.E.2d 425, 428 (1952), and *Jeffress* v. *Va. Ry. & P. Co.*, 127 Va. 694, 718-20, 104 S.E. 393, 401 (1920).

For the reasons assigned, we will reverse the judgment of the trial court and remand the case for a new trial consistent with the views herein expressed.

*Reversed and remanded.*