## Spotsylvania County School Board

### V.

## Seaboard Surety Company, et al.

Record No. 910428

February 28, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Harrison, Retired Justice

*Jack E. McClard (Ann T. Burks; Hunton & Williams*, on briefs), for appellant.

*R. Terrence Ney (Thomas F. Farrell, II; M. Melissa Glassman; McGuire, Woods, Battle & Boothe*, on brief), for appellee Sherman Construction Corporation.

*William W. Thompson, Jr. (Richard F. Lane; Thompson & Waldron*, on brief), for appellee Seaboard Surety Company.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

On May 14, 1987, the Spotsylvania County School Board (the School Board or the Board) and Sherman Construction Corporation (Sherman) entered into a contract for the construction of Courtland Elementary School in Spotsylvania County. The agreed cost of construction was $4,360,000, and the stipulated completion date was not later than August 15, 1988.

The School Board was empowered to terminate the contract "[i]f the Contractor . . . persistently disregard[ed] laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or otherwise [was] guilty of a substantial violation of a provision of the Contract Documents." The School Board's right to terminate, however, was conditioned upon "certification by the Architect that sufficient cause exist[ed] to justify such action."

Construction commenced, but the School Board and the project architect (the architect) soon became dissatisfied with the quality of Sherman's performance. On May 9, 1988, upon certification by the architect that sufficient cause existed, the School Board gave Sherman notice that the construction contract was terminated.

On the same date, the Board gave notice of Sherman's default to Seaboard Surety Company (Seaboard), Sherman's surety on the performance bond required by Code § 11-58. In the notice, the Board called upon Seaboard to "move promptly to discharge its responsibilities under the Bond."

By an agreement dated June 6, 1988, Seaboard undertook to perform all work not completed by Sherman. Seaboard employed Sherman as its subcontractor to complete the project, and Sherman proceeded with the work in that role. However, the School Board and the architect again complained about Sherman's performance, and, on November 23, 1988, upon certification by the architect that sufficient cause existed, the Board gave notice that it was terminating Seaboard as replacement general contractor and taking possession of the construction site. The Board then engaged another contractor, and the project was completed at a total cost of "well over $8,000,000.00," with occupancy delayed one full year past the August 15, 1988 date required under the Board's contract with Sherman.

On December 6, 1988, the School Board filed a bill of complaint praying for a declaration that Seaboard had violated the terms of its performance bond by failing to pay the cost of completing the school building. The Board also prayed for an award of damages against Seaboard for its alleged breach.

On March 30, 1989, Sherman filed a motion for judgment against the School Board seeking damages for the Board's alleged breach of the construction contract. In that action, the School Board filed a counterclaim against Sherman for damages resulting from Sherman's alleged breach. The Board also moved to join Seaboard as an involuntary plaintiff to Sherman's motion for judgment.

The trial court transferred the School Board's bill of complaint from equity to law, consolidated that suit with Sherman's law action, and denied the Board's motion to join Seaboard as a party plaintiff. Later, the School Board filed a motion for judgment against Seaboard in place of the Board's original bill of complaint. The Board then amended that motion for judgment as well as its original counterclaim to add a claim that Seaboard had refused in bad faith to "perform or settle" under its performance bond.

By pretrial order, the trial court directed that the trial consist of three phases, first, liability of the parties, second, damages, and third, remaining issues. Over the School Board's objection, the case was submitted to a jury on the question whether the School Board was justified in terminating its contract with Sherman. On that issue, the jury decided in favor of Sherman. The trial court then conducted a hearing on damages and entered judgment in favor of Sherman in the amount of $146,430.

Concerning the School Board's claims against Seaboard, the trial court granted Seaboard's demurrer to the Board's bad-faith claim but overruled it with respect to claims for indemnification and fraudulent inducement. After the jury verdict, the court granted Seaboard's motion for summary judgment as to all claims asserted against Seaboard, with the exception of the claims for indemnification and fraudulent inducement. The court then allowed the School Board to nonsuit the indemnification and fraudulent inducement claims. We awarded the School Board an appeal to review its assignments of error as well as Sherman's assignments of cross-error and Seaboard's cross-appeal.

## THE SCHOOL BOARD vs. SHERMAN DISPUTE

### *The Board's Motions to Strike and Set Aside*

The major points of dispute between the School Board and Sherman involve the manner in which roof joists and a second-floor concrete slab were anchored to supporting walls, the way a bond beam was constructed, the method used to install a fire wall, the condition in which utility trenches were left, and the effectiveness of efforts to control erosion. The Board maintains that the defects resulting from Sherman's treatment of these items constituted contract violations and that the shortcomings in the anchoring of the roof joists and the second-floor slab also violated "the BOCA Code," creating per se breaches of the contract.[1]

Sherman makes no real contest of the fact that defects resulted from its treatment of the foregoing matters or that the defects may have constituted violations of the contract documents and even the BOCA Code. Sherman says, however, that "[w]hether those mistakes are so persistent and so sufficient as to amount to a substantial violation of the contract justifying termination . . . is a factual question to be decided by the trier of fact." Hence, Sherman concludes, the trial court properly submitted the question to the jury.[2]

---

[1] BOCA is an acronym for the Building Officials and Code Administration. Pursuant to Code § 36-98, the Virginia Board of Housing and Community Development has promulgated and adopted the Uniform Statewide Building Code, which is patterned after BOCA model codes. *Fairfax County* v. *M. & S., Inc.*, 222 Va. 230, 233, 279 S.E.2d 158, 159 (1981). The parties to this controversy agree that "the BOCA Code was incorporated by reference in Sherman's contract with the School Board."

[2] Sherman also argues it is only "at substantial completion and final payment" that "all work is required to be completely in compliance with the contract documents." However, in *VEPCO* v. *Savoy Const. Co.*, 224 Va. 36, 294 S.E.2d 811 (1982), the trial court informed the jury that the provisions of the National Electric Code, which were incorporated by reference into the Uniform Statewide Building Code, "were not applicable until the project was 'offered for acceptance' to the owner." *Id.* at 43, 294 S.E.2d at 816. Reversing, this Court said that an "important purpose of the . . . Building Code . . . is to enhance the safety of those working on the project and, indeed, the safety of the project itself," *id.* at 44, 294 S.E.2d at 817, and that "[t]here must be compliance with the Building Code not only when work is performed but also when work required by the Building Code should be done to safeguard persons and property." *Id.* at 45, 294 S.E.2d at 817. This rule is applicable here, especially with respect to defects, such as those in the second floor slab and the fire wall, which had been concealed by ongoing construction. As one of Sherman's own witnesses admitted, "the covering up or concealment of nonconforming work [is not] consistent with a contractor intending to bring it into conformance."

The School Board argues on the other hand that the evidence established as a matter of law that Sherman "persistently disregard[ed applicable] laws . . . or otherwise [was] guilty of a substantial violation of a provision of the Contract Documents" and, therefore, that the trial court erred in refusing to strike Sherman's evidence and set aside the jury's verdict. In support of this argument, the School Board cites what it describes as "dramatic evidence from Sherman's own witnesses about serious violations of the BOCA Code."

The Board says the BOCA Code requires that "every roof joist be 'positively anchored' down" and "this requirement was to be accomplished in this elementary school by welding the joists to steel bearing plates, each plate having two 'Nelson' studs that were to be embedded in the grout of the bond beam." Yet, the Board points out, a company hired by Sherman to inspect the joists determined that of 109 bearing plates inspected, 55 had no reinforcing and only 11 met the BOCA Code requirements.

Furthermore, the Board asserts, Thomas E. Speight, Sherman's project superintendent, admitted that "Nelson" studs were removed from the bearing plates with a cutting torch and that installation of the plates with the studs removed was a BOCA Code violation. And, the Board states, Thomas A. Downey, Jr., an expert witness called by Sherman, admitted that the bearing-plate condition "was a significant structural defect" while Michael E. Matthews, another Sherman expert, conceded that the failure to anchor so many bearing plates was a "persistent" BOCA Code violation.

Matthews also conceded, the Board continues, that the "bearing-plate condition at the roof joists" was "a material violation" and that the as-built condition of the bond beam was a "material noncompliance."[3] Hence, the Board asserts, Matthews admitted that Sherman was guilty of at least two substantial violations of the contract, *viz.*, the failure to anchor roof joists properly and the unworkmanlike construction of the bond beam.

Even if we assume, however, that the School Board is correct in its assertion that the admissions of Sherman's witnesses

---

[3] Designed to hold a building together, a bond beam is built "around the perimeter at the roof of the building [with] cinder blocks that are trough shaped, U shaped, and . . . have a couple of reinforcing bars in them, and then they are filled in with some kind of cementitious material." In order to be effective, a bond beam must be continuous. As built in this case, it was not.

were sufficient to establish as a matter of law that Sherman persistently disregarded applicable laws and otherwise was guilty of substantial violations of the contract documents, it does not follow that the Board is entitled to judgment in its favor. The admissions cannot be considered alone and in the abstract but must be considered in the context of other issues the trial court submitted to the jury, issues of a defensive nature which impacted directly upon the question of Sherman's liability. And, if it is determined that the trial court properly submitted those issues to the jury, then Sherman's ultimate liability would also be a jury question.

The other issues were two, namely, whether the School Board interfered with Sherman's performance of the contract and whether errors in the design of the school building and discrepancies in the plans caused problems Sherman encountered during construction. With respect to the first issue, the School Board maintains that the trial court erred in granting this instruction:

> A party to a contract who wrongfully hinders or prevents the other party from performing his obligations under a contract has breached the contract. This implied condition is founded upon the principle that he who prevents a thing from being done may not avail himself of the nonperformance for which he alone is responsible. The principle does not apply when the hindrance is due to action taken by such party which he is permitted to take under the terms of the contract.

The School Board says "[t]here is no evidence anywhere in [the] record" to support the instruction and, moreover, what the Board did was entirely "within its contract rights." We disagree.

■ The target of Sherman's claim of interference was the conduct of Raymond Louis Herlong, who was project architect during the period in which Sherman's contract was terminated.[4] The record is replete with evidence of actions on Herlong's part that hindered Sherman in the performance of its obligations under the contract, actions that cannot be justified as being "within the [School Board's] rights."

For example, Herlong gave contradictory instructions to construction personnel, saying "one thing today [and] tomorrow . . .

---

[4] The jury was instructed that the School Board's "architects and engineers" were its agents. This included Herlong.

something else." On occasion, he refused requests from Sherman's project superintendent for instructions. He seemed unwilling "to see a job completed." He would not allow the project superintendent to follow the usual practice of discussing "a design or construction problem [with] the [project] engineer." He even refused to permit a structural engineer employed by Sherman as a consultant to talk to the School Board's structural engineers; the consultant had never "had that happen to [him] before" in the thirty-one years of his practice, and he testified that "you just can't work that way." Finally, in the words of one of Sherman's witnesses, "[t]here was active interference" by Herlong "in the construction that [Sherman was] trying [to] complete."

As noted, the second issue involves design errors and discrepancies in plans.[5] On brief, the School Board discusses this issue under the broad heading: "The [Trial] Court Erred by Allowing Testimony of Events Prior to the Execution of the Contract, Despite a Merger Clause." We will demonstrate *infra* that the trial court did err in admitting evidence of pre-contract discussions and correspondence. We think, however, that the question of design errors and discrepancies in plans is a different matter, one not subject to the strictures of the merger clause. And, because resolution of that question is pertinent to the larger issue of whether Sherman's liability was for the jury to decide, we will at this point separate out and consider the portion of the School Board's argument concerning design errors and discrepancies in plans.

The Board argues that evidence of "concerns related to the plans and drawings" was inadmissible because it "suggested to the jury that [those concerns] were not resolved before bids were let and the Contract executed." The Board says this evidence permitted Sherman to redesign the building and "to substitute a new and different contract for the one agreed upon, to the prejudice of [the School Board]."

In admitting the evidence in question, the trial court ruled that the evidence was relevant to the question whether the errors and discrepancies caused problems with "work in the field" or delay in completion of the project. The trial judge stated specifically that Sherman would not be allowed to redesign the building or to change the contract. Given the limited purpose for which the evi-

---

[5] Glenn Mills, who preceded Thomas Speight as Sherman's project superintendent, kept a log of discrepancies he found in the plans. He testified the count totalled more than four hundred.

dence was admitted, we do not think the trial court erred in permitting the jury to consider it. If, upon the retrial ordered *infra*, Sherman offers similar evidence, it should again be admitted for the same limited purpose.

■ We conclude that whether the School Board was justified in terminating its contract with Sherman was a jury question. It follows that the trial court did not err in refusing to strike Sherman's evidence or in failing to set aside the jury's verdict.

### Instructions on Breach of Contract

■ At the outset of this opinion, we noted that the School Board was given the right to terminate the contract if Sherman was "guilty of a substantial violation of a [contractual] provision." In two jury instructions, the trial court added the words "material" and "materially" to the contractual test for termination. As a result, one instruction defined the issue in the case as "[whether] Sherman . . . materially or substantially" breached the contract and another instruction defined in the following words what would constitute a breach:

> A material or substantial breach of contract occurs if a party fails to do something which he is bound to do according to the contract. [The] breach must be a failure to do something which is so important and central to the contract that the breach of the obligation defeats the purpose of the contract.

The School Board argues that the addition of the words "material" and "materially" to the instructions imposed "a heavier burden upon the . . . Board to establish its right to terminate than the Contract imposed." On the other hand, Sherman argues that, according to established principles, the words parties use in a contract should be given their "usual, ordinary, and popular meaning." Citing BLACK'S LAW DICTIONARY 1280 (5th ed. 1979), Sherman says that when the words used here are given their usual meaning, "material" is synonymous with "substantial" and, therefore, use of the added words did not increase the burden imposed upon the School Board.

We disagree with Sherman. The instructions imposed upon the School Board the burden of proving that Sherman's breach consisted of "a failure to do something which is so important and

central to the contract that the breach of the obligation *defeats the purpose* of the contract." (Emphasis added.) This language might define the proper burden where the parties have not agreed upon a test for determining when the contract may be terminated. *See* 1 S. Stein, *Construction Law* § 4.14 (1991). But, here, "substantial violation" was agreed upon as the test, and we do not think the burden of proving a substantial violation carries with it the necessity of also proving that a breach defeats the purpose of the contract. Only if the word "material" is added to the test can the imposition of this further burden be justified.

Because the word "material" does not appear in the contractual language and because its use improperly heightened the burden imposed upon the School Board, it was error of reversible proportions to grant the instructions in question. This necessitates a remand for a new trial and requires that we address several questions that may recur.

### Evidence of Pre-Contract Events

The School Board contends that the trial court erred in admitting evidence of pre-contract discussions and correspondence between the parties. The Board argues that where parties have reduced their contract to writing and have agreed that the document contains their entire agreement, the contract is the sole evidence of their undertaking. The Board points out that the rationale for this rule is that evidence of previous communications between the parties would tend to substitute a new and different contract for the one agreed upon, to the prejudice of one or the other of the parties. Here, the Board says, the evidence was improperly admitted and its admission was prejudicial.

■ We agree with the Board. The trial court ruled that the contract was unambiguous. Furthermore, a merger clause in the contract stated that the document "represents the entire and integrated agreement between the parties . . . and supersedes all prior negotiations, representations, or agreements, either written or oral." Hence, there was no reason or authority to admit evidence of pre-contract discussions and correspondence. Any similar evidence should be excluded upon retrial.[6]

---

[6] Our ruling on this point renders moot the School Board's further argument that since evidence of pre-contract matters was admitted, an instruction informing the jury of the existence and operation of the merger clause should have been granted.

## Evidence of "Overdesign"

Over the School Board's objection, the trial court admitted evidence that the school building was "overdesigned." In a candid admission on brief, Sherman states that it offered the evidence to establish "that the plans were so far overdesigned and required so many features beyond what was necessary to insure a certain level of safety that [Sherman's] failure to comply with each and every aspect did not render [Sherman's] performance defective, result in an unsafe building, or amount to defective work sufficient to warrant termination."

The School Board queries on brief: "Since Sherman agreed to build the building as designed, how can it later be heard to object it was overdesigned?" The response to this question seems so obvious that it should not be necessary to state the answer. But, lest there be any doubt upon retrial, the answer is that the contract, not the contractor, controls what design features are necessary and what are not. Hence, evidence of "overdesign" should be excluded upon retrial.

## Instructions on Specifics of Contract

Citing *Evans* v. *Briley*, 221 Va. 1042, 1045, 277 S.E.2d 184, 186 (1981) (party entitled to go to jury under instructions presenting his theory), the School Board contends the trial court erred in refusing instructions telling the jury that Sherman had agreed to construct the building in accordance with the contract, to study the contract documents carefully and report errors, to correct promptly any defective work, and to follow prescribed methods of making changes in the contract. Hence, the School Board concludes, it was improperly denied the right to have its theory of the case presented to the jury by way of instructions.

Sherman says that what the Board really complains about "is the [trial] court's refusal to pull out isolated and scattered references to the contract and to make them jury instructions." According to Sherman, this would have given the jury "the impression that some provisions of the contract were more important than others."

We agree with Sherman. Had the instructions in question been granted, the trial court would have placed itself in the position of singling out and commenting upon particular aspects of the evidence. Eschewing that position, the court instructed the jury it

should consider the contract "as a whole." This instruction gave counsel for the School Board the opportunity to emphasize specific contractual provisions in argument, an opportunity counsel will have upon retrial.[7]

## Damages

After the jury returned its verdict in favor of Sherman in the first phase of the trial, a hearing was convened to determine damages as between the School Board and Sherman. The trial court ruled that Sherman would be permitted to present evidence only with respect to two requests for payment it had made for work performed prior to the termination of its contract. The court ruled further that the School Board could only present evidence concerning offset damages for the cost of repairing specific items listed in Sherman's two requests for payment. The rulings satisfied neither party and have resulted in an assignment of error by the School Board and cross-error by Sherman.

## The School Board's Assignment of Error

The School Board argues that it should have been allowed to offset against Sherman's claim "the millions of dollars it had to expend to repair Sherman's defective construction." The Board claims to find support for its position in two provisions of the contract. One provision states that "[t]he Contractor shall bear all costs of correcting . . . rejected Work, including compensation for the Architect's additional services made necessary thereby." The other provision stipulates that "[i]f at any time deficiencies in the work are discovered which result from work not in accordance

---

[7] The School Board offered, and the trial court refused, an instruction which would have told the jury that it was uncontroverted Sherman violated the BOCA Code and that a violation of the Code amounted to a violation of the contract. The Board contends the trial court erred. In support of its position, the Board cites the rule recognized in tort cases that a violation of the BOCA Code constitutes negligence per se. *See, e.g., MacCoy* v. *Colony House Builders*, 239 Va. 64, 387 S.E.2d 760 (1990). We express no opinion upon the abstract question whether a violation of the BOCA Code also constitutes a per se violation of a contract. As Sherman points out, the instruction in dispute failed to relate the purported BOCA infractions to the "substantial violation" standard established by the contract as the test for determining whether Sherman breached the contract. Lacking this relationship, the instruction was incomplete and misleading and would have permitted the jury to find a breach by Sherman without also finding the breach was substantial. Hence, it was not error for the trial court to refuse the instruction.

with Contract Documents, Contractor shall be held liable for replacement or correction, regardless of time limit on the warranty."

The School Board says that, "according to the Contract, Sherman was liable for all costs of correcting its defective work, even after the end of the Contract." Sherman argues to the contrary, citing *Hurley* v. *Bennett*, 163 Va. 241, 253, 176 S.E. 171, 175 (1934), where this Court stated that "[t]he party who commits the first breach of a contract . . . is not entitled to enforce it, or to maintain an action thereon, against the other party for his subsequent failure to perform."

Rebutting, the School Board says this Court relaxed *Hurley's* "rigid rule of no recovery" in *Kirk Reid Company* v. *Fine*, 205 Va. 778, 788-89, 139 S.E.2d 829, 836-37 (1965), and *Erlich* v. *Hendrick Construction Co.*, 217 Va. 108, 114-15, 225 S.E.2d 665, 669-70 (1976). In those cases, the Board states, this Court declined to apply the *Hurley* rule in construction cases.

■ We do not think that the two contractual provisions quoted above were intended to apply in the event the School Board was the party breaching the contract. Neither provision contains any language indicating it was included in contemplation of such an event, and, in our opinion, they are inapplicable in light of the jury's verdict in favor of Sherman on the question of liability.

■ With respect to the "no recovery" rule recognized in *Hurley*, there may be some question of the extent to which the rule has been relaxed by the *Kirk Reid* and *Erlich* decisions. In any event, they are inapposite. Neither case involved a party whose breach consisted of terminating the contract unjustifiably before the other party could complete the undertaking, as the jury found the School Board breached the contract here. Given the jury verdict establishing the nature of the School Board's breach, the trial court did not err in the limitation it put on the damage evidence the Board could present. Therefore, upon retrial, if a jury finds that the Board unjustifiably terminated the contract, the Board should again be denied the right to present evidence of the cost of its post-termination repairs.

### Sherman's Cross-Error

Under the contract, if the School Board terminated the contract with cause and the cost of finishing the work exceeded the unpaid balance, then Sherman would be obligated to pay the difference to the Board. If, however, the Board terminated the contract without

cause, then Sherman would be entitled to payment for work executed, including profit, and for any proven loss sustained on any materials, but not for profit on labor or materials not furnished.

The School Board's letter of May 9, 1988, terminating the contract with Sherman, stated that "sufficient cause exists to justify termination." At the hearing which was convened to determine damages, counsel for the School Board stated that the jury, by its verdict in favor of Sherman, had found that the Board "did not have cause to terminate [the contract]."

Counsel for the Board then took the position that the termination was one without cause and, therefore, that Sherman's damages were limited to the items listed in the contractual provision relating to termination without cause. The trial court agreed with the Board and applied the without-cause provision to limit Sherman's damages.

Sherman says that the School Board had two options. First, it could terminate the contract with cause and recover from Sherman the cost of completing the school. Second, it could terminate without cause, in which case Sherman would not be liable for the cost of completion but could recover for all work performed. Sherman argues that when the Board chose the with-cause ground of termination, it made an election to which it is bound. Furthermore, Sherman asserts, the jury's verdict did not transform the Board's action from a with-cause into a without-cause termination but "only invalidated the action of the School Board."

We do not agree with Sherman's argument concerning election. In *Arwood* v. *Hill's Adm'r*, 135 Va. 235, 243, 117 S.E. 605, 606 (1923), we said:

> A party cannot, either in the course of litigation or in dealings *in pais*, occupy inconsistent positions. Upon that rule election is founded . . . . And where a man has an election between several inconsistent courses of action, he will be confined to that course which he first adopts . . . .

We do not find any inconsistency in the with-cause and without-cause provisions of the contract or in the action of the School Board in relying upon both provisions. Rather than being inconsistent, we think the without-cause provision was an additional protection bargained for by the School Board.

In this connection, we consider it significant that while the termination-with-cause provision is part of the printed form contract executed by the parties, the termination-without-cause provision became part of the contract by way of an addendum specifically agreed to by the parties. This indicates an intention on the part of the School Board, acquiesced in by Sherman, to guard against the very eventuality which occurred here — a finding by a court or jury that a termination considered justified by the Board was in fact without cause. The trial court's ruling gave effect to this intention of the parties.

Reiterating the "no recovery" rule recognized in *Hurley* v. *Bennett, supra*, Sherman argues further that "[o]nce the jury found that Sherman . . . had been terminated improperly, the . . . Board could no longer rely on *any* provision of the contract." (Emphasis in original.) Hence, Sherman concludes, the trial court erred in ruling that Sherman's damages were limited by the without-cause provision of the contract and that it should have been permitted to present evidence showing "it had incurred over $2 million in damages as a result of the School Board's wrongful termination."

The difficulty with this argument is that it ignores the fact that the without-cause provision was placed in the contract in contemplation of an improper termination by the School Board. As the trial judge noted in rejecting Sherman's argument on the point:

[I]t's obvious that the School Board wanted to cover itself and say, [b]ut if we make a mistake and terminate without cause, we want to limit your damages. So that is the [reason for the] addition of [the without-cause provision]. There's no other way to construe that clause, other than a limitation-of-damages clause. The owner is seeking to protect itself in the event its termination is without cause.

Contracting parties are certainly free to agree ahead of time upon the measure of damages that will apply in the event of a breach, and, once a certain measure is agreed upon, it controls the extent of recovery. If, upon retrial, a jury finds that the School Board's termination of its contract with Sherman was without cause, the trial court should again limit Sherman's presentation of damage evidence to the two requests for payment it made for work performed prior to termination.

## THE SCHOOL BOARD vs. SEABOARD DISPUTE

As noted earlier in this opinion, the trial court sustained Seaboard's demurrer to a count in the School Board's amended motion for judgment and amended counterclaim alleging that Seaboard had refused in bad faith to "perform or settle" under its performance bond. The court's action in sustaining the demurrer is the subject of an assignment of error by the Board.

We also noted that the court granted Seaboard's post-verdict motion for summary judgment with respect to all claims asserted by the Board, with the exception of claims for indemnification and fraudulent inducement. The court's failure to sustain Seaboard's demurrer and to grant summary judgment on the indemnification claim is the subject of a cross-appeal by Seaboard.

### *The School Board's Assignment of Error*

The School Board argues that the trial court erred in sustaining Seaboard's demurrer to the Board's claim of bad-faith refusal on Seaboard's part to "perform or settle" under its performance bond. However, Seaboard points out a procedural default which bars consideration of the School Board's argument.

Seaboard's demurrer was sustained by order entered July 25, 1990. On September 25, 1990, the jury returned its verdict in favor of Sherman. On the same date, Seaboard filed a motion for summary judgment "regarding all claims by the School Board against Seaboard" on the basis that, "as a result of the jury's verdict in Sherman's favor . . . , Seaboard has no liability to the School Board as a matter of law."

In the final order entered December 20, 1990, the trial court granted Seaboard's motion for summary judgment "as to all claims asserted against Seaboard . . . with the exception of the . . . School Board's claim based upon the indemnification agreement and fraudulent inducement." The order recited that, in argument upon the motion, "counsel for the . . . School Board advised the Court it could not oppose the motion for summary judgment because it was well grounded as long as the jury's verdict stands and the Court's [final judgment] stands."

It is obvious, of course, that, once this opinion is handed down, the jury's verdict and the trial court's final judgment will no longer stand. Yet, as Seaboard states on brief, "[n]o appeal was taken by the School Board from [the] provision of the Final Or-

der" in which Seaboard was granted summary judgment "as to all ·claims asserted against Seaboard [with the noted exceptions]."

█ The provision as to "all claims" clearly includes the School Board's bad-faith claim against Seaboard. But no assignment of error challenges the award of summary judgment with respect to that claim. Accordingly, we will dismiss as improvidently awarded the School Board's appeal involving this aspect of the case.

### Seaboard's Cross-Appeal

Seaboard argues that the trial court erred in overruling its demurrer and denying its post-verdict motion for summary judgment with respect to the School Board's claim for indemnification. Countering, and citing *Wilcox* v. *Lauterbach Electric Co.*, 233 Va. 416, 420, 357 S.E.2d 197, 199 (1987), the School Board argues that the questions raised by the demurrer and motion are moot because it was allowed to nonsuit its indemnification claim and no appeal lies from an order of nonsuit. In rebuttal, Seaboard says the question is not moot for the following reasons:

> The School Board argues that Seaboard's demurrer and motion for summary judgment were mooted when the trial court granted its motion to nonsuit the indemnification claims. No authority is cited for this bizarre proposition. The denial of [its] demurrer and motion [was] part of an appealable final order and judgment. This Court granted Seaboard's petition for a cross-appeal. Under Virginia law, an appeal may be made by "any person . . . aggrieved . . . [b]y a final judgment in any . . . civil case." Va. Code Ann. §8.01-670(A)(3).
>
> The School Board, however, presumes to re-cast Seaboard's cross-appeal as an appeal of its nonsuit, which of course it is not. Seaboard appeals the denial of its demurrer and motion for summary judgment, which preceded the nonsuit motion and must be judged on the merits of the factual and legal issues before the trial court at the time. That the School Board later nonsuited its claim is completely irrelevant.

(Brackets and ellipses in original.)

█ It is true that the School Board has not cited any authority for the proposition that the nonsuit mooted the questions raised by

Seaboard's demurrer and motion for summary judgment. If any authority is needed for such a proposition, we now supply it: When a party nonsuits a claim after a demurrer has been overruled and a motion for summary judgment denied, the questions raised by the demurrer and motion are mooted and cannot be raised on appeal.

 Seaboard's argument suggests that somehow the trial court acted improperly in allowing the nonsuit. If that is the complaint, Seaboard should have made the point the subject of an assignment of error. Because Seaboard has not filed such an assignment and because the questions it seeks to raise are moot, we will dismiss its cross-appeal as improvidently awarded.

For the reasons assigned, the judgment in favor of Sherman will be reversed, the jury's verdict set aside, and the case remanded for a new trial consistent with the views expressed in this opinion.

*Reversed and remanded.*

JUSTICE COMPTON, with whom RETIRED JUSTICE HARRISON joins, dissenting.

I do not agree that the judgment in favor of Sherman should be reversed due to the trial court's use of the words "material" and "materially" in the instructions outlining the contractual test for termination by the School Board.

In the first place, I do not believe that the court erred in using the words. According to the contract, Sherman could be terminated if guilty of a "substantial" violation of a provision of the contract documents. Words used by parties in their contract normally are given "their usual, ordinary, and popular meaning." *Winn* v. *Aleda Constr. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984). According to popular meaning, "material" is synonymous with "substantial." Black's Law Dictionary 1428 (6th ed. 1990); Webster's Third New International Dictionary 2280 (1981).

Consequently, use of the words "material" and "materially," along with "substantial," could not have placed a heavier burden upon the School Board to establish its rights to terminate than the contract imposed. Indeed, by its very terms, the instruction related the language "defeats the purpose of the contract," found objectionable by the majority, not just to a "material" breach of con-

tract but also to a "substantial" breach of contract; hence, the burden placed by use of "material" was equal, not heavier.

In the second place, even if the trial court erred in using "material" and "materially," I would not hold that such a minor error necessitates a reversal. Code § 8.01-678 mandates that when it "plainly appears" from the appellate record and the evidence presented at the trial "that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be . . . reversed" because of any "defect, imperfection, . . . or for any error committed on the trial."

After a seven-day trial, a local jury has found against the local school board. This verdict has been confirmed by the trial judge. The record demonstrates that the parties, especially the School Board, have had a fair trial and that substantial justice has been obtained.

I would not put the litigants to the time and expense of further litigation of these issues because of an imperfection in two instructions. There is no such thing as a perfect trial; a litigant is entitled to a fair trial and to nothing more.